1           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK
2

3    -----------------------------------X
                                       :
4    SEUNGICK CHUNG,                   :
                                       :   14-CV-07187 (KAM)
5              Plaintiff,              :
            v.                         :
6                                      :   225 Cadman Plaza East
     GRACE ROAD CHURCH, *et al.*,      :   Brooklyn, New York
7                                      :
               Defendants.    :   December 18, 2017
8    -----------------------------------X

9
           TRANSCRIPT OF CIVIL CAUSE FOR INQUEST HEARING
10            BEFORE THE HONORABLE ROBERT M. LEVY
              UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12

13   For the Plaintiff:        DANIEL P. SCHOLFIELD, ESQ.
                               Lynch Traub Keefe & Errante
14                             52 Trumbull Street
                               PO Box 1612
15                             New Haven, Connecticut 06506

16

17   Court Transcriber:        RUTH ANN HAGER, C.E.T.**D-641
                               TypeWrite Word Processing Service
18                             211 N. Milton Road
                               Saratoga Springs, New York  12866
19

20

21

22

23

24

25


     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.

2

1                               I N D E X

2  WITNESSES              DIRECT      CROSS      REDIRECT      RECROSS

3  Sung-Ho Hwang            4

4    By the Court          43

5

6

7  EXHIBITS                                    Ident.        Evid.

8  Plaintiff's Exhibits:

9  P-1  Decree appointing conservator            6             6

10 P-2  Acceptance of conservatorship            6             7

11 P-3  Acceptance of conservatorship            6             7

12 P-4  Continuation of conservatorship          6             7

13 P-5  Police report                           16            17

14 P-6  Police report                           16            17

15 P-7  Transcript of recorded conversation     14            16

16 P-8  New York Hospital Queens records        21            --

17 P-9  CD - digital copy of Exhibit 8          21            --

18 P-10 Medical report                          25            --

19 P-11 Post-operative report                   31            --

20

21

22

23

24

25

Sung-Ho Hwang - Direct                    3

1   (Proceedings began at 11:35 a.m.)

2           MR. SCHOLFIELD:  With me is Attorney Sung-Ho Hwang,

3   who's the conservator of the estate of Seungick Chung.  We

4   apologize for our tardiness.  There was a --

5           THE COURT:  Not a problem.

6           MR. SCHOLFIELD:  -- tractor/trailer turned over.

7           With the Court's indulgence, I know we're tardy

8   here, if we could have maybe a five-minute recess just to get

9   our --

10          THE COURT:  Sure.

11          MR. SCHOLFIELD:  -- exhibits put up.

12          THE COURT:  No, let -- let me just call the case.

13          This is docket number 14-CV-7187, *Chung v. Grace

14  Road Church, et al.*, and we're here for an inquest hearing.

15  Okay, take a break.

16          MR. SCHOLFIELD:  Thank you.

17          (Off the record.)

18          THE COURT:  Let's call the case again.  Okay,

19  we're -- are we ready?  Okay.  We're -- we're on the record.

20  This is Chung v. Grace Road Church, *et al.*, 14-CV-7187.  Will

21  counsel please state his appearance for the record?

22          MR. SCHOLFIELD:  Yes, Your Honor.  Attorney Daniel

23  Scholfield of Lynch Traub Keefe & Errante here for the

24  plaintiff.  My understanding is that the defendants have been

25  defaulted and are not appearing.  With me here today is

1   Attorney Sung-Ho Hwang. who is the conservator of the person

2   and estate of Seungick Chung, the individual who is in this

3   case.

4          THE COURT:  All right.  I'm going to ask you to

5   stand up while you're administered the oath.

6                        SUNG-HO HWANG, SWORN

7          THE COURT:  Proceed.

8                        DIRECT EXAMINATION

9   BY MR. SCHOLFIELD:

10  Q.   Attorney Hwang, would you please state your full

11  name for the record?

12  A.   Sung-Ho Hwang.

13  Q.   And what's your business address?

14  A.   1 Audubon Street, New Haven, Connecticut.

15  Q.   Are you a member of the Bar of Connecticut?

16  A.   I am.

17  Q.   And also the Bar of New York?

18  A.   Federal Eastern and Southern District Court in New

19  York?

20  Q.   When were you admitted to the Bar in Connecticut?

21  A.   '92.

22  Q.   And what have been your primary areas of practice

23  since that time?

24  A.   Civil litigation and immigration law.

25  Q.   Were you born in the United States?

Sung-Ho Hwang - Direct                                   5

1    A.    No, I was born in South Korea.

2    Q.    And at some point in time you moved to the United

3    States and became a citizen?

4    A.    Yes, that's correct.

5    Q.    And are you fluent in Korean, sir?

6    A.    Yes, I am.

7    Q.    Now, did there come a time several years ago when you

8    became involved with an individual named Seungick Chung?

9    A.    Yes.

10   Q.    And briefly tell his Honor how that happened.

11   A.    I was called by a secretary of the Probate Court and

12   they were trying to find a Korean/American attorney that could

13   handle this conservatorship for Mr. Chung.

14   Q.    Did you learn through those conversations that Mr. Chung

15   was going to be conserved?

16   A.    Correct, yes.

17   Q.    And at the time did you learn why he was becoming

18   conserved?

19   A.    It had to do with what had happened during the care

20   of his sister and his parents and I think the Probate Court

21   felt that he needed a conservator.

22   Q.    And that was a --

23            THE COURT:   Could you just clarify which court --

24   Probate Court it was?

25   BY MR. SCHOLFIELD:

Sung-Ho Hwang - Direct                             6

1    Q.    Was that a court in Connecticut?

2    A.    Yes, Hartford Probate Court.

3    Q.    And in front of you, sir, do you have an exhibit

4    marked Exhibit 1?

5    A.    I do.

6    Q.    I believe it's Bates-stamped Chung 1295 at the

7    bottom.

8    A.    That's correct, yes.

9    Q.    And is that a decree from the Probate Court

10   appointing a conservator for the person and estate of Seungick

11   Chung?

12   A.    It is.

13   Q.    And does it list you as the person to be appointed?

14   A.    Yes, it does.

15         MR. SCHOLFIELD:  Your Honor, I move that it be

16   admitted as a full exhibit.

17         THE COURT:  Any objections?  Yes, admitted.  Thank

18   you.  May I take a look at this?

19         (Plaintiff's Exhibit 1 Admitted Into Evidence)

20         MR. SCHOLFIELD:  Yes.  And just -- just for the sake

21   of brevity, Your Honor.

22   BY MR. SCHOLFIELD:

23   Q.    Attorney Hwang, do you have Exhibits 2, 3 and 4 also

24   in front of you?

25   A.    I do.

Sung-Ho Hwang - Direct                                7

1   Q.   And are those in seriatim your acceptance of the

2   trust, the actual fiduciary certificate from the Probate Court

3   appointing you?

4   A.   It is.

5   Q.   That's -- that's 2 and 3.  And then is Exhibit 4 the

6   most recent order we have from the Probate Court indicating

7   that the conservatorship will continue?

8   A.   Yes.

9         MR. SCHOLFIELD:  Your Honor, I'd offer all three of

10  those into evidence.

11        THE COURT:  Admitted.

12   (Plaintiff's Exhibit 2 through 4 Admitted Into evidence.)

13        THE COURT:  And I -- I know you're about to do this,

14  but if you could just explain for the record what the role of

15  the conservator is under Connecticut law, please.

16  BY MR. SCHOLFIELD:

17  Q.   Sir, do you have an understanding as to what the

18  role of a conservator is under Connecticut law?

19  A.   I do.  Essentially I act in the best interests of

20  Mr. Chung who has a disability.  He has been diagnosed with

21  schizophrenia, so he cannot make his own decisions.  And there

22  was an incident with the family, so the family -- so the

23  Probate Court felt that an independent person would be --

24  would act in the best interests of Mr. Chung and make the

25  various decisions of life decisions and financial decisions.

Sung-Ho Hwang - Direct                                  8

1   Q.   Now at the time you became the conservator of Mr. Chung,

2   do you know where he was living?

3   A.   He was at Trinity, which is a -- a nursing care

4   facility for mental health.

5   Q.   Where is that located?

6   A.   It's located in Hartford, Connecticut.

7   Q.   And sometime after your appointment as conservator,

8   did you have an occasion to go and meet with Mr. Chung?

9   A.   I did.  I met with him approximately a month after I

10  was appointed.

11  Q.   And where did you meet him?

12  A.   I met him at the facility up in Hartford.

13  Q.   Do you know about when that was?  What time of year?

14  A.   That was maybe June of 2013.

15  Q.   Now --

16           THE COURT:  I'm sorry, can you explain again what

17  kind of facility that was?

18           THE WITNESS:  It's a nursing home type of facility

19  for mental health, people that -- that have severe mental

20  health issues.

21           THE COURT:  So people who -- who can't live on their

22  own and need medical care as well as --

23           THE WITNESS:  Mental health care.

24           THE COURT:  -- mental health care?

25           THE WITNESS:  Correct.

Sung-Ho Hwang - Direct                                   9

1          THE COURT:  So both mental -- mental health care and

2    medical care?

3          THE WITNESS:  That's correct.

4          THE COURT:  Okay.  Thank you.

5    BY MR. SCHOLFIELD:

6    Q.   And can you describe for his Honor the physical status of

7    Mr. Chung when you first met him.

8    A.   When I first met him he was heavily sedated.  He was

9    in a wheelchair and he pretty much could not, you know, have a

10   coherent sentence.  He was kind of rambling a little bit.  He

11   was a little bit angry.

12   Q.   Can you describe his physical constitution for his

13   Honor?

14   A.   Very thin.  Had -- he had lost a lot of weight and

15   obviously his leg was amputated above the knee.

16   Q.   Which leg, do you recall?

17   A.   I think it was the right leg.

18          THE COURT:  Now, you said he'd lost a lot of weight.

19   How did you know that since that was the first time you met

20   him?

21          THE WITNESS:  The medical reports stated that he had

22   lost a lot of weight since he was first admitted to the

23   hospital in New York.

24   BY MR. SCHOLFIELD:

25   Q.   You did -- you had also mentioned he appeared thin.

Sung-Ho Hwang - Direct                          10

1   Were you able to see bones through his skin or anything like

2   that?

3   A.   Yeah, he was -- he was pretty emaciated.

4            THE COURT:  And I'm sorry, you said he had lost

5   weight according to the medical records from the time he'd

6   been -- first admitted to the hospital in New York.  Is that

7   something you're --

8            MR. SCHOLFIELD:  Yeah, we're getting there.

9            THE COURT:  Okay.  Okay.

10           MR. SCHOLFIELD:  It's sort of a --

11           THE COURT:  Sure.

12           MR. SCHOLFIELD:  -- in a roundabout way, Your Honor,

13  but.

14           THE COURT:  That's fine.

15  BY MR. SCHOLFIELD:

16  Q.   Now, can you describe the facility itself?  What

17  kind of facility -- I know you've told -- mentioned that it

18  was a healthcare facility.

19  A.   When I went back into the facility itself, the first

20  thing you'd smell was human excrement.  It was pretty shocking

21  and kind of not kept up well.  There was a lot of patients and

22  you can hear the screaming.

23  Q.   It wasn't a -- it wasn't a nice place to be, I take

24  it?

25  A.   No, it was actually kind of -- that was the first

1  time I've ever seen something like that.  It was pretty --

2  pretty bad.

3  Q.   Now, I guess skipping ahead a little bit, did -- in

4  your role as conservator, did you conduct any investigation as

5  to why Mr. Chung needed to be conserved?

6  A.   I did.  I was approached by his father after I was

7  appointed and he had told me the story of what had happened to

8  Mr. Chung and to see whether or not there could be something

9  done.  Do you want me to talk about that or --

10  Q.   Yeah, let's talk first about that first meeting --

11  A.   Okay.

12  Q.   -- with Mr. Chung's father.  Where did that meeting

13  occur?

14  A.   He came to my office.

15  Q.   And what was the sort of character of the

16  meeting?  Was it a happy meeting or something else?

17  A.   I'm sorry?

18  Q.   Was it a happy meeting or was it something else?

19  A.   Oh, I think so.  I think he was happy that somebody,

20  an attorney was involved with this case.  And he told me a

21  story of what happened that was pretty shocking.

22  Q.   Well, let's get the -- let's start with this first.  Was

23  it your understanding that Mr. Chung was involved in an

24  incident that caused him to lose his right leg?

25  A.   Yes.

Sung-Ho Hwang - Direct                    12

1   Q.   And what did your father -- what did his father --

2   excuse me -- but what did his father tell you about that

3   incident?

4   A.   He told me a brief synopsis of how he was taken to

5   New York City by his sister who was involved in a church.  And

6   he said that they had taken him off his meds because he was

7   about -- maybe six or seven or eight years prior to this

8   incident he's been diagnosed with schizophrenia.  So they took

9   him -- took him off his meds.  They thought that they could

10  heal him through religious prayer.

11          THE COURT:  "They" meaning who?

12          THE WITNESS:  The church.

13  BY MR. SCHOLFIELD:

14  Q.   Maybe I should ask a couple follow-up questions.  Did

15  the father know anything about the church?

16  A.   He knew that his daughter was involved with this

17  church.

18  Q.   Did you at some point in time during your

19  investigation go to speak with the sister?

20  A.   I did.

21  Q.   And when did that happen approximately?

22  A.   Probably the late summer of 2013.

23          THE COURT:  Could you identify her by name, please?

24          MR. SCHOLFIELD:  Yeah, her name is Myung, M-Y-U-N-G,

25  dash, Hee, H-E-E, Chung.

1          THE WITNESS:  He had said that she was involved with

2    this church, that the leader of the church was coming to New

3    York.

4    BY MR. SCHOLFIELD:

5    Q.    This is what Myung-Hee Chung informed you of?

6    A.    Yes.

7    Q.    And first, was that a recorded conversation?

8    A.    Yes.

9    Q.    Did you inform her that you were recording her?

10   A.    Yes, I did.

11   Q.    You did?  Did you ever --

12   A.    I actually went to meet her as part of my

13   investigation about what had happened after the father brought

14   this to my attention.  He actually told me that -- he gave me

15   a written statement saying that Kevin wanted to bring a

16   lawsuit against the church, so I did an investigation.  I

17   actually went to meet his sister.  I recorded that

18   conversation.

19   Q.    And --

20   A.    His sister was -- this was after the sister was

21   released from -- from jail.

22   Q.    Is it your understanding that his -- Mr. Chung's

23   sister was incarcerated as a result of the incident we're here

24   to discuss today?

25   A.    That's right.

Sung-Ho Hwang - Direct                              14

1   Q.   When you did meet her, where was she physically

2   located?

3   A.   She was in Washington State, Seattle.

4   Q.   Did you have an understanding as to what she was

5   doing in Seattle?

6   A.   Yes.  They were opening up another church in

7   Seattle.

8   Q.   Well, in any event, the sister was involved in the

9   church.  What was the church's name?

10  A.   Grace Road Church.

11  Q.   And, first of all, do you have an exhibit marked

12  Exhibit 7 in front of you?

13  A.   I do.

14  Q.   And as we indicated earlier, you had had the

15  statement given by the sister recorded.  Is that correct?

16  A.   That's correct.

17  Q.   And afterwards at your request, did my office have

18  it transcribed by a court reporter?

19  A.   Yes.

20  Q.   And is Exhibit 7 the transcription of the recorded

21  statement of Ms. Chung?

22  A.   It is.

23        THE COURT:  When -- was this -- was the statement

24  made in English or Korean, which?

25        MR. SCHOLFIELD:  There -- there are some times, Your

                    Sung-Ho Hwang - Direct                    15

1   Honor, where you'll notice it says "Speaks in Korean," but for

2   the most part it's in English.

3           THE COURT:  And the part that are Korean, are those

4   parts translated or not?

5           MR. SCHOLFIELD:  We did not have them translated.

6           THE COURT:  Okay.

7           MR. SCHOLFIELD:  But I would offer it at least as a

8   basis for Mr. Hwang's knowledge as to what was going on and

9   what happened.

10          THE COURT:  Yes.  And the statements made by

11  Mr. Chung's father are out-of-court statements.  Are they, in

12  your view, admissible in this proceeding and, if so, under

13  what exception or if not, why not?

14          MR. SCHOLFIELD:  The exception would be I think to

15  show Mr. Hwang's mental impression in explaining why he did

16  what he did.  They don't necessarily -- the father's

17  statements don't necessarily have to be admissible for the

18  truth.

19          THE COURT:  Okay.

20          MR. SCHOLFIELD:  With the sister, our argument --

21  actually years ago at this point in the United States District

22  Court in Connecticut was that she was effectively an agent of

23  the church and at the time that argument was accepted.  That's

24  how we had to respond to the affidavit I think to that.  So we

25  would argue that her statements are -- are admissible as

                    Sung-Ho Hwang - Direct                    16

1    statements in interest [ph.].

2              THE COURT:  Okay.

3              MR. SCHOLFIELD:  Thank you, Your Honor.

4         (Plaintiff's Exhibit 7 Admitted Into Evidence.)

5    BY MR. SCHOLFIELD:

6    Q.   Did you have an understanding as to how Ms. Chung

7    became involved in the church in the first place?

8    A.   She got -- I think she was involved for a long time

9    and she was just an ordinary member and then she got recruited

10   to actually start opening up other churches, so she's kind of

11   a higher level because she opened up New York and she was in

12   the process, when I met her, opening up the Seattle,

13   Washington church.

14   Q.   Per Ms. Chung, do you have an understanding as to

15   where the primary headquarters of this church was?

16   A.   In Korea.

17   Q.   In any event from speaking -- did you also obtain

18   police reports --

19   A.   I did.

20   Q.   -- for your investigation in this matter?  And do

21   you have Exhibits 5 and 6 in front of you?

22   A.   I do.

23   Q.   Are those two separate police reports you obtained

24   as part of your investigation as conservator from two separate

25   incidents:  one on September 25th, 2012 and one on October 12,

Sung-Ho Hwang - Direct                                17

1   2012?

2   A.   Yes, it is.

3            MR. SCHOLFIELD:  Your Honor, we'd offer these as

4   well.

5        (Plaintiff's Exhibits 5 and 6 Admitted Into Evidence.)

6   BY MR. SCHOLFIELD:

7   Q.   And I guess Mr. Hwang, not to maybe fast-track it

8   too much, but from speaking to the sister, speaking to the

9   father and reviewing the police reports, what did you learn

10  had happened to Mr. Chung?

11  A.   Mister --

12           THE COURT:  Let me just interrupt you for one

13  second.

14           Can you explain to me again how you got these police

15  reports?

16           THE WITNESS:  Yeah, I think it was FOIA.  We did an

17  app -- I think we did -- I did a FOIA application to the

18  police and they sent us the -- the report.

19           THE COURT:  All right.  So it's your testimony that

20  these documents, Exhibits 5 and 6, are the documents that

21  were -- that you received as a result of a state law, federal

22  information claim?

23           THE WITNESS:  Yes, Your Honor.

24           THE COURT:  A federal -- so a State FOIA claim,

25  okay.  Thank you.

Sung-Ho Hwang - Direct                    18

1          MR. SCHOLFIELD:  My apologies, Your Honor.

2          THE COURT:  Oh, and one other question.  When you

3   visited the daughter in Seattle did you visit her at a Grace

4   Church office or --

5          THE WITNESS:  They were in the process of opening up

6   the church so it was in a rented house and the people that

7   were there were her fiance and another minister.

8          THE COURT:  Where -- was that location officially

9   part of the church, do you know?

10         THE WITNESS:  Yes.  I believe that the church had

11  rented that space out and then they were in the process of

12  finding additional space at that -- that they would, you know,

13  have their services.

14         THE COURT:  And that that's what Mr. Chung's sister

15  told you?

16         THE WITNESS:  Yes.

17         THE COURT:  Thank you.

18  BY MR. SCHOLFIELD:

19  Q.   Attorney Hwang, did you come to have an

20  understanding as to what had happened to Seungick Chung?  And

21  we'll walk through it step by step.

22  A.   Sure.

23  Q.   And beginning with his sister bringing him to

24  Connecticut, what -- what happened?

25  A.   So --

Sung-Ho Hwang - Direct                    19

1  Q.   Excuse me.  His sister bringing him from Connecticut to

2  New York.  What happened?

3  A.   So at that time they were in the process of opening

4  up the New York church.

5           THE COURT:  I'm sorry, what time was this?

6           MR. SCHOLFIELD:  What time is -- I mean, it's --

7           THE WITNESS:  This is late September, beginning of

8  October of 2013.  So I think --

9  BY MR. SCHOLFIELD:

10 Q.   Would looking at a police report refresh your

11 recollection as to the year?

12 A.    Yeah.  I'm sorry, 2012.

13 Q.    There you go.

14 A.    2012.  All right.  So she had brought them up.  The head

15 of the church from Korea was in New York at this facility and

16 the sister believed that this head of the church had special

17 powers and she had told me that -- that she believed that she

18 could -- this head of the church could cure her brother

19 through religious prayer.

20 Q.    Cure him of what?

21 A.    Schizophrenia.  And they -- so she brought him over.

22 They took him off his medication.

23 Q.    About what time is your understanding

24 this --

25 A.    Around the same time.  As soon as they brought him

Sung-Ho Hwang - Direct                                      20

1   over they ceased all the medication and he became very loud

2   and combative.  He had at one point left the facility.

3   Q.   Do you have an understanding about when that was?

4   A.   That was, I think, within a couple of days after he

5   had arrived.

6   Q.   And do you know if they called the police when he

7   left the facility?

8   A.   They did.  They called the police, but then they

9   were able to find him and --

10  Q.   Do you know if --

11  A.   -- and bring him back.

12  Q.   Do you know if that incident generated the

13  September 25th, 2012 police report that's been marked as

14  Exhibit 5?

15  A.   Yes.

16  Q.   In any event, you said they were able to find him and

17  bring him back.  And then what's your understanding as to what

18  occurred?

19  A.   So then they decide to duct tape him down to his --

20  in -- in bed.

21  Q.   Do you have an understanding as to -- first of all,

22  where was he located in the church facility?

23  A.   The sister had told me that he was in the basement.

24  Q.   When they duct taped him, what parts of his body

25  did they tape?

Sung-Ho Hwang - Direct                    21

1    A.   They duct taped his -- well, she admitted that they

2    duct taped both legs and both arms.   The medical reports also

3    show markings around the mouth and the neck, so there was most

4    likely a restraint around the neck, and also the -- I think

5    there was some medical evidence that he was gagged.

6    Q.   Let's walk through that.   What -- what did the

7    medical reports indicate as to why he was gagged?  Well,

8    actually we should back up a second.  Do you have exhibit --

9    marked Exhibit 8 in front of you?

10   A.   I do.  And this is the complete set of medical

11   reports from the New York Hospital.

12   Q.   Is that -- is that New York Hospital Queens?

13   A.   Correct.

14   Q.   And then what's the rest of that because there's --

15   there's quite a bit there.  Is there something else there?

16   A.   In addition to -- well, there's lots of stuff here.

17   Q.   Do you -- do you know if it has any records from

18   Trinity Hill Healthcare?

19   A.   Yes, it does also have records from Trinity.

20   Q.   And you have a CD in front of you, don't you?

21   A.   I do.

22   Q.   Is that marked Exhibit 9?

23   A.   It is.

24   Q.   And is it your understanding that that Exhibit 9

25   contains a digital copy of what is Exhibit 8?

1   A.   Yes.

2           MR. SCHOLFIELD:  Your Honor, we'd offer Exhibit 9.

3   I won't -- I won't do you the disservice of giving you --

4           THE COURT:  Right.  Can you authenticate it as a --

5   as an accurate business record?

6           MR. SCHOLFIELD:  I think I can, Your Honor.  In what

7   sense?

8           THE COURT:  Well, I mean in other words, how is this

9   admissible at this point?  I mean, medical records typically

10  are, but we don't have the medical records custodian here.

11  How -- how did you get them?  What -- why are they admissible?

12  BY MR. SCHOLFIELD:

13  Q.   Attorney Hwang, did you execute a HIPAA in favor of

14  my office at some point in time?

15  A.   I did.

16  Q.   Are you aware whether we used that HIPAA form to

17  request medical records?

18  A.   Yes.  Your office requested these medical records

19  through my authorization.

20  Q.   And after we did receive the medical records, did

21  you have an opportunity to review them?

22  A.   I did.

23  Q.   And did they fit what you understood to be the

24  treatment of Mr. Chung from your investigation and your times

25  [indiscernible]?

Sung-Ho Hwang - Direct                                    23

1   A.   They are.

2   Q.   Did you visit him only once at Trinity or was there

3   more than one time you would go visit?

4   A.   It was multiple times.

5   Q.   Over the course of how long?

6   A.   About a year.

7        MR. SCHOLFIELD:  Your Honor, we'd offer them that

8   way.  I guess I can also state that if necessary I can get a

9   custodian's affidavit.  But as Your Honor's aware from our

10  other correspondence to the Court, there's a lawsuit against

11  Trinity for --

12       THE COURT:  I know.

13       MR. SCHOLFIELD:  -- their failings, so it might

14  be --

15       THE COURT:  They may not be happy, yes.

16       MR. SCHOLFIELD:  So, I guess, Your Honor, on that

17  basis I'd offer them as -- to his understanding as a --

18  BY MR. SCHOLFIELD:

19  Q.   Actually, do you understand as a conservator of

20  estate that you're also custodian of Mr. Chung's records?

21  A.   I am.

22       MR. SCHOLFIELD:  I would offer it on that basis,

23  Your Honor.

24       THE COURT:  Custodian means I have a property

25  interest in that in some way?

Sung-Ho Hwang - Direct                 24

1          MR. SCHOLFIELD:  He's responsible for any property

2    that belongs to Mr. Chung and I think under our federal laws

3    and other laws his medical records are theoretically his

4    property as well.

5          THE COURT:  So he can -- he has access to them and

6    he can consent to their release if necessary?

7          MR. SCHOLFIELD:  Presume -- theoretically yes, Your

8    Honor.

9          THE COURT:  No, but I mean him.

10         MR. SCHOLFIELD:  Oh, Mister -- Mr. Hwang, yes.

11         THE COURT:  Yes.

12         MR. SCHOLFIELD:  Yes, Your Honor.

13         THE COURT:  And do you know whether these records

14   were made in the ordinary course of business at the hospital?

15         THE WITNESS:  I'm sure that they were, Your Honor.

16   I -- I think they were executed through the HIPAA

17   authorization.

18         THE COURT:  Okay.  Was there any cover letter or

19   certification that came with them?

20         MR. SCHOLFIELD:  There was, Your Honor.  Let me get

21   that out.  And you know what, Your Honor, I'm noticing out of

22   all the things I have, I know exactly where it is and it's

23   sitting on my desk.

24         THE COURT:  Oh, not a problem.  Just --

25         MR. SCHOLFIELD:  I'll upload it.

1          THE COURT:  -- just submit it to the Court.

2          MR. SCHOLFIELD:  Just upload it through CMF later?

3          THE COURT:  Yes.  Just file it, you know, when you

4   get back.  Thanks.

5          MR. SCHOLFIELD:  I apologize.

6          THE COURT:  Okay.  Not a problem.

7          MR. SCHOLFIELD:  Can we have a provisional ruling

8   that --

9          THE COURT:  Yes.  The doctor -- these documents are

10  admitted as the medical records of Seungick Chung from the two

11  facilities just discussed, New York Hospital and Trinity

12  Hills.  They were received on the basis of a HIPAA request and

13  once the Court receives the certification that these are in

14  fact the medical records of those entities the Court will

15  admit them.

16         MR. SCHOLFIELD:  Now one -- one thing for purposes

17  of the record, Your Honor, just to put on there I know when we

18  were reviewing these records we discovered several -- I think

19  two pages that were not for Mr. Chung.  They were from some

20  other individual.  I have no idea why they were provided to

21  us, but I would like to identify the Bates numbers because we

22  pulled them out and obviously threw them away.  It would be

23  Bates numbers 592 and 593 will be missing for that reason.

24  Thank you, Your Honor.

25  BY MR. SCHOLFIELD:

Sung-Ho Hwang - Direct                        26

1   Q.   Okay.  As you indicated earlier, you were discussing

2   that the medical records show that there were constriction

3   marks to Mr. Chung's neck, is that --

4   A.   That's correct.

5   Q.   Is that your understanding?  And I think if you want

6   to pull the band off and I'm going to hand this to you.  I'm

7   going to hand you -- I'm going to show you Chung 10.

8            MR. SCHOLFIELD:  I'd like to approach very quickly ,

9   Your Honor, while I --

10            THE COURT:  Sure.

11            THE WITNESS:  All right.  Just give -- give me those

12   and -- okay.

13   **BY MR. SCHOLFIELD:**

14   Q.   Sir, in front of you you have pulled out of Exhibit 8

15   Bates stamps Chung 10 and Chung 11?

16   A.   I do.

17   Q.   And first of all what's Chung 10?  Can you briefly

18   describe for Your Honor which that one is?

19   A.   Medical report ran by the vascular -- attending

20   physician for the -- for vascular at New York Hospital Queens.

21   Q.   Okay.  And does this to your understanding describe

22   the vascular's observations of Mr. Chung when he was initially

23   presented to the hospital?

24   A.   Yes, it does.

25   Q.   All right.  Now we are still getting ahead of

Sung-Ho Hwang - Direct                              27

1  ourselves, so we'll back up a little bit as to what was

2  happening at the church facility, if you can set those aside.

3  Now, you testified earlier it's your understanding that

4  Ms. Chung elected to duct tape Mr. Chung to a bed, is that

5  correct?

6  A.   Well, yes, the -- not just her but everybody else

7  that was -- that was there.

8  Q.   All right.  And who would that include, to your

9  understanding?

10 A.   Her fiancé was there, the leader of Grace Road

11 Church and a number of other individuals that were living

12 there.  I think they said maybe ten -- ten people that were

13 never identified to me.

14 Q.   Was it your understanding that this church facility

15 had residential space for the members?

16 A.   Well, this -- they were conducting church in a house so

17 So they rented the house and then were -- they were conducting

18 the worship at the house.

19 Q.   Did you understand that various members would stay

20 at the house overnight?

21 A.   Yes.  They would all live there also.

22 Q.   And you mentioned the leader of the church.  Do you

23 have a -- off the top of your head do you know who that is?

24 A.   I -- I don't have her exact name.

25 Q.   If I was to say Ok-Joo Shin, would you understand

                    Sung-Ho Hwang - Direct                    28

1   that --

2   A.   That's correct, yes.

3   Q.   -- that person has been named as a defendant in this

4   lawsuit?

5   A.   Yes.

6   Q.   And in the complaint that was originally drafted

7   was she named as a defendant as a lead -- as the leader of the

8   church?

9   A.   Yes.

10  Q.   Do you have an understanding as to when Mr. Chung

11  was duct taped to a bed?

12  A.   I believe October 2nd.

13  Q.   What's the basis of your understanding that it was

14  October 2nd?

15  A.   The fiancé made a statement to the police officer.

16  Q.   Who's the fiancé?  Who was that?

17  A.   He -- I probably have to refresh my recollection, but

18  I can't think of the name of the fiancé.

19  Q.   Who was he engaged to be married to?

20  A.   Oh, Kevin's sister.

21  Q.   That being Myung-Hee Chung?

22  A.   Correct.

23  Q.   And is it your understanding that he was also a

24  member of this church?

25  A.   Yes, he was.

1  Q.   Is it your understanding that he was also involved

2  in the incidents we're here to discuss today?

3  A.   Yes.

4  Q.   And he is one of the individuals who gave statements

5  to the police.  Is that your understanding?

6  A.   Yes.

7  Q.   And was he present when you interviewed Myung-Hee

8  Chung on June 25th, 2013 in Seattle?

9  A.   Yes, he was.

10  Q.   And you had conversations with him as well?

11  A.   Yes, I did.

12  Q.   And it's your understanding from him that about --

13  about October 2nd was when they duct taped Mr. Chung to the

14  bed?

15  A.   Yes.

16  Q.   Do you have an understanding as to how long Mr. Chung

17  remained duct taped to the bed?

18  A.   Approximately ten days, 2000 -- October 12th, 2012 was

19  when he was brought to the hospital.

20  Q.   And do you have an understanding as to what occurred

21  over that ten-day period with Mr. Chung and his physical

22  conditions?

23  A.   Yes.  He developed gangrene in one of his legs.  For

24  a number of days they noticed that it was discolored.  They

25  decided to just massage it and at a certain point the leg

```
            Sung-Ho Hwang - Direct                    30
```

1  became deformed and then they decided to bring him to a

2  dermatologist who referred him to the emergency room.

3  Q.   And did --

4           THE COURT:  I'm sorry, when you say "they" can you

5  identify who you mean?

6           THE WITNESS:  The people at the church.  So it was I

7  guess the minister and the rest of the members, including his

8  sister and his fiancee -- her fiancé.

9           THE COURT:  Did that include Ok-Joo Shin?

10          THE WITNESS:  Yes.

11          THE COURT:  And how do you know that?

12          THE WITNESS:  She was a leader of the church so

13  everything was done with -- through her order and control and

14  she was there living at the facility.  So I'm sure that

15  none -- nothing would be done without her permission.

16          THE COURT:  Was there any statement to that effect

17  made either by the fiancé or the sister?

18          THE WITNESS:  No, Your Honor.

19  **BY MR. SCHOLFIELD:**

20     Q.   Is it your understanding that -- did the fiancé and

21  the sister at one point say that they were the only ones

22  involved, the church had nothing to do with it?

23  A.   They decided to take the blame.

24  Q.   Is that contained in the June 25th, 2013 statement?

25  A.   Yes.

1  Q.   They elected to take the blame and they maintain

2  that Ok-Joo Shin, despite being in the house, had no idea that

3  this was going on?

4  A.   I guess that's what their claim was that -- you know,

5  that they are the only ones that were at fault.  And then so

6  the police arrested them only.

7  Q.   Did you later learn that the church had paid for

8  Myung-Hee Chung and her fiance's criminal defense bill?

9  A.   Yes.

10 Q.   You were testifying that Mr. Chung was brought to

11 the hospital.  Do you know which hospital?

12 A.   He was brought to a dermatologist first, which I do

13 not know the name of the dermatologist.

14 Q.   Okay.

15 A.   And that day he was brought to the emergency room.

16 I guess it was the New York Hospital Queens.

17 Q.   And is that -- do you know if that's where his leg

18 was ultimately amputated?

19 A.   Yes.

20 Q.   Now, if you'll turn back to Chung 10 which is in

21 front of you and we won't have you read it into the record.

22         MR. SCHOLFIELD:  But I -- I would ask Your Honor to

23 look at it later.  It's Bates-stamp 2010.

24 BY MR. SCHOLFIELD:

25 Q.   Does that -- does that describe the condition of the

Sung-Ho Hwang - Direct                              32

1  leg upon presentation?

2  A.   Yes, it does.

3            MR. SCHOLFIELD:  And Your Honor, we also quoted from

4  that specifically in our damages [indiscernible].

5  BY MR. SCHOLFIELD:

6  Q.   And in essence, does it -- does it describe a dead

7  limb?

8  A.   Yes.

9  Q.   Does it describe the limb as cold to the touch?

10 A.   Yes.

11 Q.   Does it describe visibly thrombosed veins?

12 A.   Yes.

13 Q.   Now, if you look at Chung 11 which I think you might

14 have just handed up to His Honor is, is that -- is it your

15 understanding that this is a -- this document would be a post-

16 operative report?

17 A.   Yes, it is.

18 Q.   And does it indi -- excuse me -- does it indicate

19 anything about the expectations going into the surgery and

20 whether they were met?

21 A.   Yes, it does.

22 Q.   What does it state about that?

23 A.   Stable.

24 Q.   Does it indicate whether they had to -- again, I'm

25 asking a bad question -- whether they had to amputate more

Sung-Ho Hwang - Direct                          33

1  than expected??

2  A.    Yes.  They went in and they -- it says -- yeah.

3  They said that "significant non-viable muscle in the distal

4  thigh."

5  Q.    Now, after the amputation do you have an

6  understanding as to approximately how long Mr. Chung was

7  confined to New York Hospital Queens?

8  A.    He was there for a month.

9  Q.    And do you have an understanding as to what was

10  occurring during that time?

11  A.    Yes.  It's all contained in the medical report.

12  Q.    And I'll hand this to you.  It's [indiscernible].

13          MR. SCHOLFIELD:  Your Honor, approach, please?

14          THE COURT:  Yes.

15          MR. SCHOLFIELD:  Your Honor, these are from

16  Exhibit 8, which is also Exhibit 9.  We are looking

17  specifically at Bates-stamped 22 and 23.

18  BY MR. SCHOLFIELD:

19  Q.    And Mr. Hwang, do those describe physical therapy

20  sessions with Mr. Chung?

21  A.    It does.

22  Q.    And do you have an understanding as to why he was

23  receiving physical therapy?

24  A.    Well, yeah.  He had lost the -- the leg above the

25  knee.

1  Q.   Are those documents there describing essentially

2  teaching him how to walk again?

3  A.   That's correct.

4  Q.   Now, if you look at Bates-stamped pages 31 and 32,

5  do you have those in front of you now -- also from Exhibit 8

6  and Exhibit 9 -- do you understand that to be a progress

7  report?

8  A.   Yes, it does.

9  Q.   Do you see a date on it?

10 A.   Date is November 2nd, 2012.

11 Q.   This would be about 20 days or so after he initially

12 presented to the hospital then?

13 A.   That's correct.

14 Q.   And does -- does page 31 -- Bates-stamped page 31

15 specifically describe that Mr. Chung is suffering from

16 uncontrolled hypertension?

17 A.   That's correct.

18 Q.   Now, how old is Mr. Chung?  Do you have an

19 understanding as to how old he was when this incident

20 occurred?

21 A.   At that time I think he was 26.

22 Q.   He's a young man -- it's your understanding that he

23 was a young man?

24 A.   Yes.

25 Q.   Now, if you look at -- do you have Bates-stamped page 36

Sung-Ho Hwang - Direct                    35

1  in front of you?

2  A.   I do.

3  Q.   Is that an additional progress note for Mr. Chung?

4  A.   It is.

5  Q.   And does it have a date on it?

6  A.   November 19th, 2012.

7  Q.   So this is approximately two weeks later.  Does it

8  indicate that he's now experiencing left foot pain?

9  A.   Yes.

10 Q.   Do you have an understanding as to how that came to

11 develop?

12 A.   It was because he had lost his right -- right leg so

13 he had to over compensate.

14 Q.   Now, when you first met Mr. Chung you said it was in

15 approximately June of 2013, is that correct?

16 A.   That's correct.

17 Q.   And that would have been eight months after he had

18 presented to New York Hospital Queens?

19 A.   Yes.

20 Q.   And you described him for His Honor as sluggish and

21 still very pale -- or, excuse me -- not pale but very thin and

22 things like that?

23 A.   Yes.

24 Q.   Did you -- do you have a page in front of you marked

25 50?

Sung-Ho Hwang - Direct                    36

1  A.   50?

2  Q.   Yeah, Bates-stamped 50.

3  A.   I do not.

4  Q.   Okay, let me grab it for you.  That's right because

5  I have it.  Mr. Hwang, do you have an understanding as to what

6  Bates-stamped 50 is?

7  A.   A yearly physical update --

8  Q.   From?

9  A.   -- for Mr. Chung.

10 Q.   Sorry.  From what facility?

11 A.   Since it's the beginning I would think it's from --

12 Q.   Did I not give you the front page?

13 A.   Yeah.

14 Q.   That's my mistake.  Okay.  Here's -- my apologies.  Chung

15 49 is the cover page for Chung 50.

16 A.   Okay.

17 Q.   Does that indicate which facility that that was --

18 A.   That's Trinity Hill Healthcare in Hartford,

19 Connecticut.

20 Q.   And does exhibit -- does Bates-stamped 50 purport to

21 offer yearly progress updates -- excuse me -- on Mr. Chung?

22 A.   Yes, it does.

23 Q.   And is there two progress updates listed there, one

24 for 2013 and one for 2014?

25 A.   Yes, it does.

Sung-Ho Hwang - Direct                                    37

1   Q.   In different columns?  And if you go down to

2   "Diagnosis" on the left-hand column, which is for 2013, do you

3   see that?

4   A.   Yes.

5   Q.   And are you able to decipher what it indicates

6   there?  Do you see SPAK -- or excuse me -- RAKA?

7   A.   I'm just trying to find the column that you're

8   looking through.

9   Q.   I'm sorry, it's the left-hand column.

10  A.   The left-hand column.

11  Q.   And towards the bottom of the page is "Diagnosis."

12  A.   Okay, here we go.

13  Q.   Do you see that?

14  A.   Yep.  Yes, I do.

15  Q.   Do you see SPRAKA?

16  A.   I do.

17  Q.   Do you have an understanding that that means "status

18  post right above knee amputation"?

19  A.   Yes.

20  Q.   And do you see also ARF?

21  A.   Yes.

22  Q.   Do you have an understanding that that means "acute

23  renal failure"?

24  A.   Yes.

25  Q.   And is this the diagnosis of Mr. Chung a year later?

Sung-Ho Hwang - Direct                    38

1   A.   That's correct.

2   Q.   And if you go across do you see --

3   A.   Well, and also schizophrenia --

4   Q.   Right.

5   A.   -- and seizures.

6   Q.   He's suffering from seizures a year later?

7   A.   Yes.

8   Q.   Now, do you see -- if you go across do you see a

9   column for 2014?

10  A.   I do.

11  Q.   And do you see that it indicates still -- status

12  post right above knee amputation?

13  A.   Yes.

14  Q.   And schizophrenia and seizure?

15  A.   Yes.

16  Q.   And do you see that it indicates rhabdomyolysis?

17  A.   I do.

18  Q.   Do you have an understanding as to what that is?

19  A.   I think that's when tissue dies it affects your --

20  your body it -- so there's still toxins built up into your

21  body.  I think so.

22  Q.   Yeah, that's -- now I'm going to hand -- I'm going

23  to hand you the very last --

24          THE COURT:  What's the basis of your knowledge of

25  that?

```
                    Sung-Ho Hwang - Direct                    39
```

1           THE WITNESS:  I think I Googled it.  I Googled the

2   term a while ago.

3           MR. SCHOLFIELD:  I asked the nurse practitioner --

4           THE COURT:  It was certainly Googled.

5           MR. SCHOLFIELD:  I asked the nurse practitioner in

6   my office.

7   BY MR. SCHOLFIELD:

8   Q.   Mr. Hwang, I'm showing you what are the last two pages of

9   Exhibit 8 and can you just tell his Honor what those are?

10  A.   It's the medical bills.

11  Q.   Now, we aren't -- we don't have any payback in this

12  case, is that right?

13  A.   Correct.

14  Q.   But we were able to finally obtain the medical bills

15  to see how much it cost.  Is that for the amputation?

16  A.   That's correct.  We don't have the payback yet.

17  There might be a department -- a lien from the State of

18  Connecticut.

19  Q.   Do you see on the bill that it indicates Medicaid

20  HUSKY?

21  A.   Yes.

22  Q.   Is it your understanding that's what Connecticut

23  calls its Medicaid program?

24  A.   Yes.

25  Q.   After UCONN, the HUSKY?

Sung-Ho Hwang - Direct                    40

1   A.   And as an attorney I'm familiar that the most -- majority

2   of time they will seek to get reimbursed for any medical

3   expenses that they have.

4   Q.   Now, how did -- how much did New York Hospital

5   Queens charge for the amputation?

6   A.   The whole -- looks like $158,879.

7   Q.   And do you -- do you see that Medicaid made a

8   payment?

9   A.   Yes.

10  Q.   How much is that?

11  A.   $27,946.

12  Q.   Medicaid doesn't have to pay that much, right?

13  A.   No.

14  Q.   All right.  Now --

15           THE COURT:  Just one question going back to the

16  seizures.  Do you know whether he had a seizure disorder prior

17  to the incident that you complained of in the complaint?

18           THE WITNESS:  My understanding is he was just

19  diagnosed with schizophrenia and then he was only on the

20  medications for schizophrenia prior to the incident.

21           THE COURT:  So you have no record in any of --

22  either the court records or the medical records that you've

23  seen that show that he had a seizure disorder prior to the

24  incident?

25           THE WITNESS:  I've never seen any records that

Sung-Ho Hwang - Direct                    41

1   indicate that he had a seizure prior to the incident.

2          THE COURT:  And do you know if there's anything

3   connecting the seizure disorder to the incident?  And is that

4   something that you're alleging?

5          THE WITNESS:  No, Your Honor.  I think we don't know

6   what causes the seizures, so within a reasonable degree of

7   medical certainty, I -- I'm not sure if this is related.

8   However, you know, there's circumstantial evidence if somebody

9   was not suffering from seizures who went through a deeply

10  traumatic event, and my understanding when I talked to the

11  doctors was that this does have an affect on his mental well-

12  being, so the incident that actually happened, traumatic.

13  BY MR. SCHOLFIELD:

14     Q.   When you speak of the trauma, do you -- is it just

15  the loss of the leg that you're speaking of?

16  A.   No.  He went through a horrible period of time when

17  he was actually restrained with duct tape in a basement.  It's

18  pretty bad for anybody, especially somebody who already has a

19  mental illness, I think that's -- yeah.

20  Q.   Can you imagine what that would be like?

21  A.   It's pretty horrible.  It was shocking when I found

22  that out.

23          MR. SCHOLFIELD:  Your Honor, if I can just have

24  one -- just one minute to briefly look through my notes?

25          THE COURT:  Sure.  Sure.

Sung-Ho Hwang - Direct                          42

1            [Pause in the proceedings.]

2   BY MR. SCHOLFIELD:

3   Q.    Were you able to see Mr. Chung at all maybe two

4   years or three years after the accident?

5   A.    Yes.

6   Q.    Excuse me, the incident.

7   A.    Yes.

8   Q.    And when you saw him, let's say two years later, how

9   was his physical condition?

10  A.    He had improved.  So he had a prosthetic leg and

11  crutches and he was out of the wheelchair and he had gained

12  some weight.  And he was a little bit less medicated, sedated.

13  Q.    And what about three years later?

14  A.    Probably the same.

15  Q.    Now, did you understand that part of your role as

16  conservator was to provide for the life care and planning of

17  Mr. Chung?

18  A.    Yes, it was.

19  Q.    And did you conduct an investigation as to what an

20  amputee should expect to deal with throughout the course of

21  the life?

22  A.    Yes.

23  Q.    And what kinds of things did you learn about that?

24  A.    Well, he will have to suffer as -- as he wears

25  prosthetic that tissue will break down, so he will constantly

Sung-Ho Hwang - Direct                              43

1   have to get new prosthetics which are very expensive.

2   He'll --

3          THE COURT:  I'm sorry, how do you know that?

4          THE WITNESS:  I just kind of Googled it myself and

5   kind of like figured out what I needed to plan for his future

6   and see what things I -- I need.  He would need constant

7   physical therapy.  This is what the doctor had told me, that

8   he'll -- you know, his walk is -- will never be perfect

9   because it's above-the-knee amputation.  So --

10  BY MR. SCHOLFIELD:

11  Q.   Did you ever see him walk?

12  A.   I -- I did.

13  Q.   How did he walk?

14  A.   He kind of stumbled along a little bit.  He had a

15  very difficult walk.

16  Q.   Let's -- just to be clear about why you were

17  investigating, did you seek out to be a conservator of

18  Mr. Chung?

19  A.   I did not.

20  Q.   You were asked to do it by the Probate Court

21  essentially as a favor?

22  A.   Yeah.  Unlike New York, Connecticut only has a very

23  small handful of Korean-American attorneys, so they had to --

24  they tracked me down and I reluctantly agreed to do this.

25  Q.   You knew that they needed someone who spoke Korean?

Sung-Ho Hwang - By the Court                44

1   A.   Yes.

2           THE COURT:  Well, what is your specialty otherwise?

3           THE WITNESS:  I do civil litigation and immigration

4   law.

5   BY MR. SCHOLFIELD:

6   Q.   And so as a -- as a newly-appointed conservator of a

7   person who had a serious injury, did you just do whatever you

8   could to try and plan for his future?

9   A.   Yeah.  I felt really bad for him.  He was the top of

10  my list of people to really help, you know.

11  Q.   And did you -- sort of, for example, did you try to

12  consult with maybe his medical providers as to what --

13  A.   Oh, yeah.  Yeah.

14  Q.   All right.

15          MR. SCHOLFIELD:  Your Honor, at that point, I don't

16  think I have any more questions.  I -- I can give maybe a

17  three-minute summation if Your Honor wants.

18          THE COURT:  Oh, sure.  I just have a question about

19  the prosthetic and -- and the breakdown of the tissue.

20                          EXAMINATION

21  BY THE COURT:

22  Q.   Is that something you discussed with his doctors as well?

23  A.   Yes.

24  Q.   And can you tell me a little bit more about who his

25  doctors are and what their specialty is and what they told

Sung-Ho Hwang - By the Court                    45

1   you?

2   A.    He had a number of doctors.   Primarily he had a

3   psychiatrist that were -- that were medicating him.   And I

4   spoke on the phone with the psychiatrist about his condition

5   and whether or not the meds will help him, and he said that he

6   would never get better, he will always be medicated.   And --

7   Q.    Are we talking about the mental condition or --

8   A.    Yes.   Yes.

9   Q.    Okay.

10  A.    I did talk with his physical therapist, which was not a

11  doctor but a PT, and they said that -- that's when I talked to

12  them about the prosthetics and then his ability to walk and

13  ambulate.   And then he said that, yes, that tissue -- that

14  tissue was constantly going to break down, he'll need a new

15  prosthetic every so -- so many years, depending on how his leg

16  holds up.   I think those are the main doctor that I recall.   I

17  think I might have talked with somebody else, but I don't

18  recall the exact nature of that conversation, Your Honor.

19          THE COURT:   Do we have any sense of what his life

20  expectancy is?

21          MR. SCHOLFIELD:   Mainly, Your Honor, I think it's a

22  little bit difficult, Your Honor.   He was young, 26.   He did

23  have a mental disorder and one of our arguments is that makes

24  the physical limitation all the worse for him.   I would say we

25  would hope he would live at least 45 to 50 years.

Sung-Ho Hwang - By the Court                    46

1          THE COURT:  And --

2          THE WITNESS:  Well we do have the mortality tables.

3   In Connecticut they're judicial, so --

4          MR. SCHOLFIELD:  Yeah, they're considered --

5          THE COURT:  I mean, is there any reason to think

6   that he won't be -- does he conform to those tables?  Does

7   anything in his condition prior to this incident change

8   things?

9          THE WITNESS:  No.  I wouldn't -- I wouldn't say --

10  he doesn't have any things like a heart condition or things

11  that would predispose him to live a shorter time.  He has the

12  mental health issues.  As long as there are people that are

13  around him that can help him with that, that wouldn't affect

14  his life expectancy nor his amputation above the knee.

15         MR. SCHOLFIELD:  I think the only other thing to

16  note though, Your Honor, is in all fairness, the

17  rhabdomyolysis, which is, you know, toxic and subject to

18  damage from muscle tissue dying may have affected his organs,

19  but it would have been caused by the -- the loss of the leg.

20         THE COURT:  Has anyone -- any doctor mentioned that

21  or discussed how that would work?

22         MR. SCHOLFIELD:  Not -- not to me, Your Honor.  I'm

23  just trying to be fair to the Court and say there is obviously

24  evidence in -- in this stack about him having some organ

25  damage.  It wasn't significant, from what I understand.

```
                  Sung-Ho Hwang - By the Court              47
1            THE WITNESS:  And he had the compromised renal
2   function for a couple of years, Your Honor.
3            THE COURT:  Do we know whether that limits his life
4   expectancy?
5            MR. SCHOLFIELD:  I don't off the top of my head,
6   Your Honor.
7            THE COURT:  Okay, thanks.
8            MR. SCHOLFIELD:  Thank you, Your Honor.
9   BY THE COURT:
10  Q.   Oh, also for the mortality tables, these are Connecticut
11  mortality tables?
12  A.   No, we used the standard.  I used the Social Security.
13           MR. SCHOLFIELD:  Yeah, we used the Social Security
14  one.  In -- in Connecticut they're just sort of deemed
15  admitted.
16           THE WITNESS:  They're deemed admitted.
17           THE COURT:  Okay.
18           MR. SCHOLFIELD:  I --
19           THE WITNESS:  Not that anybody --
20           MR. SCHOLFIELD:  I can upload them though, Your
21  Honor.
22           THE COURT:  Well, I'm sure we have them.  Maybe used
23  them in our trials as well.  So that's what you would be
24  urging the Court to look at?
25           THE WITNESS:  Yes, Your Honor.
```

Sung-Ho Hwang - By the Court                    48

1          MR. SCHOLFIELD:  Yes, Your Honor.

2          THE COURT:  With some possible discount or

3    modification as a result of the two conditions that you talked

4    about, the renal function and the rhabdomy --

5          MR. SCHOLFIELD:  Rhabdomyolysis.

6          THE COURT:  Rhabdomyolisis.

7          MR. SCHOLFIELD:  But, Your Honor, I think -- well,

8    my point is that he might have less life expectancy with the

9    leg, but I think the loss, any reduction in his life

10   expectancy at least if it's caused by that it's caused by this

11   incident.

12         THE COURT:  Right.  So you think it would be a wash

13   in that sense?  Okay.

14   BY THE COURT:

15   Q.   Anything else that you want to add that you haven't said

16   that you think is important?

17   A.   I don't think -- I don't think so, Your Honor.  I think

18   he went through a traumatic event.  I think he should be

19   compensated for what happened to him during that period.  He's

20   got to live with that amputation for the rest of his life and

21   I think it -- honestly, I believe that it worsened his

22   psychological condition.

23   Q.   Are there any other facilities that he could go to that

24   are -- that would provide a better quality of care for him?

25   A.   If he had the money, Your Honor, there are much nicer

Sung-Ho Hwang - By the Court                    49

1   private facilities that can take care of him.

2   Q.    But since he relies on Medicaid funding this is the best

3   he can get?

4   A.    Correct.  That's correct.

5   Q.    Is that because he's in Hartford or if he went to other

6   parts of Connecticut would his life be better?

7   A.    In terms of facilities, no, Your Honor.  I think they're

8   pretty much the same if he had a Medicaid facility.  If he had

9   a private facility then that would be -- that would be a game

10  changer.

11  Q.    And he has no resources at this time?

12  A.    No.

13            THE COURT:  I think that's all the questions.  Can

14  we go off the record a second?

15            (Off the record.)

16            THE COURT:  We can -- you've already made

17  submissions.  I assume you're not doing this *pro bono*.

18  Hopefully, that the Court is --

19            MR. SCHOLFIELD:  It's pretty much *pro bono*.  It's

20  $50 an hour.

21            THE COURT:  Excuse me.  Okay.  So I guess the only

22  other questions are we looking at -- I'll give you a minute to

23  think about this when we go back on the record, but if -- if

24  it --

25            (Off the record.)

1      THE COURT:  And so of the record I was just asking a

2  question as to comparables and to where the comparables --

3  what we're comparing with.  And counsel, you just mentioned

4  New York?

5      MR. SCHOLFIELD:  Yes, Your Honor.

6      THE COURT:  So do you want to just explain what

7  you -- what you did?

8      MR. SCHOLFIELD:  To be frank, Your Honor, what I did

9  was I called the attorney who were admitted *pro hac vice* and

10  we asked him what he thought the numbers were that made sense

11  and we created this chart that appears on the tenth page of

12  our submission.

13      And some of these things are very difficult to

14  value.  For example, we tried to value what it would be worth

15  to be taken off your medication that was controlling your

16  schizophrenia and to sort of lose that and to become more

17  insane, for example.  You know, we also -- we tried to provide

18  superficial injuries, so the wrists and the knees and things

19  like that.

20      I did not have an opportunity to look at verdicts in

21  New York, if that's what Your Honor's question is.  If Your

22  Honor would like us to do something like that and submit a

23  further analysis we can do so.

24      THE COURT:  That would be helpful to the Court.  You

25  know, for example, constriction injuries to ankles, knees,

51

1   wrists, neck, mouth and face, to what extent are they

2   permanent and to what extent are they -- were they time

3   limited?

4           MR. SCHOLFIELD:  They weren't permanent.  He

5   presents at the hospital with these injuries and he didn't

6   have them [inaudible], for example.

7           THE COURT:  The removal from the psychotropic

8   medication and degradation of mental state, is some of that

9   permanent or is all of it just temporary or don't you know?

10          MR. SCHOLFIELD:  We were specifically focusing on

11  that period of time when he was in the facility removed from

12  his mental state.  So we saw that as sort of different than

13  suffering post-surgery where we would look to.  To the extent

14  there was anything mental that was permanent, that's where

15  we'd look at that.  To us, this was trying to capture that

16  window of September to October 12th; he's off his medicine and

17  -- and essentially losing his mind.

18          THE COURT:  Right.  So will he be compensated?  He

19  went off psychotropic medication -- he was off psychotropic

20  medication, whatever suffering that -- mental suffering he had

21  separate from the physical suffering of being duct taped and

22  kept in a confined space, although the boundaries may be

23  difficult to discern.

24          MR. SCHOLFIELD:  There might be some overlap, Your

25  Honor.

Sung-Ho Hwang - By the Court                    52

1          THE COURT:  But -- but that's what you're -- that's

2     what you're looking at right there for a time limited period?

3          MR. SCHOLFIELD:  Correct, Your Honor.

4          THE COURT:  Okay.  And we're talking about ten days?

5     How many days are we talking?

6          MR. SCHOLFIELD:  Our understanding is that about

7     September 25th, which is the first police report, which is

8     when he's wandering about by himself essentially.  And so at

9     least from that day and potentially slightly earlier through

10    October 12th when he's brought to the hospital he's not on

11    his --

12         THE COURT:  Okay.

13         MR. SCHOLFIELD:  -- his schizophrenic medication.

14    And so is that, 15 -- 17 days then.

15         THE COURT:  Um-hum.  And do we have any description

16    of his mental state or anything from his sister or her fiancé

17    that would describe his condition, whether he was upset,

18    terrified, hallucinating, delusional?  What -- the change in

19    his mental state?

20         THE WITNESS:  During the time that this happened,

21    Your Honor?

22    BY THE COURT:

23    Q.   During that time that -- that you're seeking the damages

24    to that?

25    A.   In the recorded statement she does mention that he was

Sung-Ho Hwang - By the Court                    53

1  screaming and saying things, and she would say, "He was doing
2  things that -- that I don't even want to talk about," so like
3  that.
4  Q.   Well, for me to -- for me to evaluate it, if you don't
5  want to talk about it I need to see something in the record.
6  A.   Oh, no, no, no, I didn't -- she said that.  She didn't
7  want to talk about it.
8  Q.   Okay.  She did?
9  A.   I'm willing to answer whatever -- whatever questions.
10 Q.   Do you know what she was referring to?
11 A.   I think she was talking about him they were -- he was
12 mentioning that he had raped his sister and his mother.
13 That's in her statement.  You know, they're very crazy things.
14 Q.   But that was a delusion?  She didn't --
15 A.   Oh, no.  Yeah, yeah, that was all delusion.  But he
16 thought that that had happened and, you know, things -- things
17 along that nature.
18 Q.   And was he feeling happy about that?  Delusional about
19 that?
20 A.   No, he was really distraught.
21 Q.   Guilty?
22 A.   Yeah.
23 Q.   He was distraught.  Oh, were there any other indications
24 that he was suffering over other issues?
25 A.   Related to?

Sung-Ho Hwang - By the Court                    54

1  Q.   To anything while he was confined to that 15-day period

2  [indiscernible]?

3          MR. SCHOLFIELD:  Maybe to help Your Honor, with Your

4  Honor's indulgence.  Between --

5          THE COURT:  Sure.

6          MR. SCHOLFIELD:  Between the police reports and the

7  recorded statement from June 25th, 2013, there's also

8  descriptions about him attempting to slam his head into the

9  wall, for example, because he could hear voices and things

10 like that.  In the medical records you'll see that at least a

11 month later and I think carrying forward he continued to hear

12 voices.  And there's a report that he wouldn't tell the -- I

13 guess the psychiatrist he was speaking to at New York Queens

14 what the voices were saying but he was hearing them.  So he

15 was suffering from things like that during the period of

16 confinement, Your Honor.  That may have had something to do

17 with why they decided that the correct course of action was to

18 duct tape him to a bed.

19         THE COURT:  Do we know whether he was hearing voices

20 or had delusions or hallucinations while he was on his

21 medication and before he was taken off?

22         MR. SCHOLFIELD:  The sister claims that he -- the

23 medication never helped him.  Now, of course, we don't think

24 that she's particularly credible given what she decided to do.

25 Our understanding, and I guess Mister -- Attorney Hwang's

Sung-Ho Hwang - By the Court                  55

1   understanding is that prior to this incident his schizophrenia

2   was controlled with medication.

3                THE COURT:  Okay.

4                THE WITNESS:  He was living not in a facility.  He

5   was living with his parents at the time.

6                THE COURT:  Oh.

7   BY THE COURT:

8   Q.   And do we have -- well, you had a discussion with his

9   father.

10  A.   Yes.

11               THE COURT:  Do we have any medical records as to how

12  he was during those times -- that period, was he --

13               MR. SCHOLFIELD:  We don't have records, Your Honor.

14               THE WITNESS:  They disappeared.  They are -- both

15  parents are not around also.

16  BY THE COURT:

17  Q.   Do we know whether he was seeing a psychiatrist or some

18  other mental health professional?

19  A.   So I had the -- we had -- I had thought about that, but I

20  know that since the parents had also disappeared, I couldn't

21  find out where he was treating prior to this, who had

22  authorized -- you know, who had prescribed the medication, so

23  it's kind of hard to do a baseline.  But the baseline that I

24  think of is we have somebody that was living at home and the

25  parents had a small business so he would also stay at the

Sung-Ho Hwang - By the Court                     56

1    small business during the working hours taking his medication.

2    And now we have somebody that had to be institutionalized

3    after the accident -- after the incident.  So I think that's

4    the baseline that I --

5              THE COURT:  Right.

6              THE WITNESS:  -- that I draw.  And the facility is

7    [indiscernible], yeah.

8    BY THE COURT:

9    Q.   Was he working at the business or just --

10   A.   No, he was just there.

11   Q.   He was just there?

12   A.   Yeah.

13   Q.   But he was able to maintain self-control?

14   A.   That's correct.  That's correct.

15   Q.   Without any kind of loss of control or screaming --

16   A.   That's correct.

17   Q.   -- banging his head against the wall?

18   A.   That's correct.

19   Q.   And that's something that you know this because you spoke

20   to the parents?

21   A.   I spoke -- yeah, I spoke to the parents.  And I also

22   spoke to the sister and the sister kind of, you know, told me

23   a little bit of background of, you know, his situation.  But I

24   think what she was referring to was a cure so she had -- she

25   thought that the medication was not working because it did not

Sung-Ho Hwang - By the Court                    57

1  cure his schizophrenia, and which is obviously impossible

2  because that never goes away.  So I think that's why she was

3  saying the medication wasn't working because he was not cured

4  and that she was hoping that this minister would cure his

5  schizophrenia through prayer.

6  Q.   Did she confirm that -- that her brother was living at

7  home with his parents?

8  A.   Yes.

9  Q.   And did she confirm that he was able to go

10 to --

11 A.   Yeah, because she told me that she had brought him from

12 his parents' house to the facility in New York.

13 Q.   Okay.  Did she discuss at all what he did during the day,

14 whether he went to the small business with the parents?

15 A.   No, the small business part is what I heard from parents.

16 Q.   Were you able to independently confirm that they had a

17 small business?

18 A.   Yes.

19         MR. SCHOLFIELD:  It was a nail salon.

20         THE COURT:  Nail salon?

21 BY THE COURT:

22 Q.   All right.  And did you visit the nail salon or --

23 A.   I did not.

24 Q.   But you saw some records, so you --

25 A.   Yes.

Sung-Ho Hwang - By the Court                    58

1   Q.   And that was records provided by the parents or --

2   A.    It was statements through the parents and I think we -- I

3   had searched something on the -- on the internet probably

4   about where -- you know, where that was, but it wasn't

5   anything like that I actually saw it.

6   Q.    Right.  But they confirmed that.

7   A.    But I confirmed it, yeah.

8             MR. SCHOLFIELD:  I recall we sent an investigator to

9   speak to them at one point in time as well.

10            THE WITNESS:  Oh, that's right.  I think you guys

11  did send an investigator directly to their place and that

12  investigator actually spoke to them.

13  BY THE COURT:

14  Q.    And your description of the facility where he was

15  staying, can you tell me a little bit more about the facility?

16  You said there was screaming, the smell was of urine and

17  feces, I assume.

18  A.    And it wasn't like it was all over, but clearly there

19  were people there in bed that had soiled themselves and people

20  had -- had not gotten the chance to clean them.  It's very

21  dark.  It's very depressing.  Just some rooms, rooms on the

22  other side, just rows of rooms and then you see the

23  hospital -- the staff just -- just walking through.  He was

24  sharing a room with somebody else.  And then there were a

25  couple of other facilities that had like some PT areas.  But

Sung-Ho Hwang - By the Court                    59

1  it was just the first thing you walk in there you can smell

2  the urine and feces just, like, it was quite surprising.

3  Q.   Different from his home?

4         MR. SCHOLFIELD:  Yes.

5  BY THE COURT:

6  Q.   Do you know, did he express whether he was happy or

7  unhappy being at that facility?

8  A.   Well, he said he wanted to go home every single time we

9  saw him.

10 Q.   Did he say why?

11 A.   Not really.

12 Q.   I'm not saying you [inaudible].  Did he say he missed his

13 family, friends?

14 A.   At a certain point in the very beginning when I met him

15 he was quite angry.

16 Q.   At?

17 A.   At everybody.  His parents and had threatened them.  He

18 said that, you know, he was going to kill them.  Then we had

19 limited visitation with parents.  And then we were able -- he

20 was able to progress well enough that he was able to leave the

21 facility for short periods of time with the parents.

22 Q.   Do you know what -- what happens where he is now?

23 A.   Yes.  I guess the parents -- the mother became a member

24 of the church, brought him to -- to Korea.  He actually posted

25 a video online talking about this case in particular saying

Sung-Ho Hwang - By the Court                    60

1   that, oh, it maybe somebody whose bringing this lawsuit to the

2   church, so I know for a fact that he is in the church in

3   Korea.

4   Q.   And his parents or just his mother?

5   A.   His mother is the one that kidnapped him and his father

6   disappeared.  I don't know what happened to him.

7              MR. SCHOLFIELD:  Your Honor, if I might ask one

8   question to that point?

9              THE COURT:  Sure.

10             MR. SCHOLFIELD:  Was there a hearing at the Hartford

11  Probate Court after all that had occurred?

12             THE WITNESS:  There was.

13             MR. SCHOLFIELD:  What was the conclusion of that

14  hearing?  Was your conservatorship left in place?

15             THE WITNESS:  Oh, yes, it was.

16             MR. SCHOLFIELD:  Just so the record is clear about

17  why we're still here.

18             THE COURT:  Oh, that's okay.  Yeah.

19  BY THE COURT:

20  Q.   When you say the mother kidnapped him, is that -- are you

21  saying that she did not have the authority to take

22  him?

23  A.   That's correct.

24  Q.   Okay.  Who had the authority to determine where he lived

25  and where he --

Sung-Ho Hwang - By the Court                    61

1  A.    I do.  And one of the things that I specifically

2  instructed the facility was, is that every time that he would

3  leave the facility, they were to surrender his passport and

4  they were doing that.  And until one time they didn't and the

5  one time that they didn't is the time he disappeared.  And we

6  have the video footage showing that the mother took him from

7  the facility.

8            MR. SCHOLFIELD:  Do you recall suitcases in that

9  video, for example?

10           THE WITNESS:  I'm sorry?

11           MR. SCHOLFIELD:  Do you recall suitcases in that

12  video, for example?

13           THE WITNESS:  Yes.  Yeah, there was a number of

14  belongings.

15           MR. SCHOLFIELD:   Your Honor, if I can ask just two

16  other follow-up questions on that point?

17           THE COURT:  Yes.

18           MR. SCHOLFIELD:  Did that occur at or about a day or

19  two after an earlier Hartford Probate Court hearing?

20           THE WITNESS:  Yes.

21           MR. SCHOLFIELD:  And was that earlier Hartford

22  Court -- Probate Court hearing requesting the mother to remove

23  Mr. Chung from your conservatorship?

24           THE WITNESS:  That's correct.

25           MR. SCHOLFIELD:  And what was the conclusion of the

Sung-Ho Hwang - By the Court                    62

1   hearing?

2          THE WITNESS:  That I would continue to be a

3   conservator.

4          THE COURT:  Okay.  Is there anything you wanted to

5   add at this point?

6          MR. SCHOLFIELD:  Not at this point in time, Your

7   Honor.  We do have our previous submission.  I'd be interested

8   to know what -- what else Your Honor would like to see from

9   me.  I understand I have to get the cover letter from Trinity

10  Healthcare.

11         THE COURT:  Yes.

12         MR. SCHOLFIELD:  Which I'll do as soon as I --

13  hopefully it doesn't take three and a half hours to get back,

14  but it might be tomorrow, is all I'm saying, Your Honor.

15         THE COURT:  There's not a rush.

16         MR. SCHOLFIELD:  And Your Honor had mentioned

17  comparables.  Can I have a deadline to do that by or --

18         THE COURT:  Yeah, tell me what you think would be

19  reasonable.

20         MR. SCHOLFIELD:  I usually say a week, but then it's

21  Christmas Day.  Can I have after New Year, is that --

22         THE COURT:  Sure.  Are you thinking January 5th?

23  January 12th?

24         MR. SCHOLFIELD:  Let's do January 12th just so I can

25  get in touch with New York counsel who we're working with, so

                  Sung-Ho Hwang - By the Court                    63

1    that'd be helpful.

2              THE WITNESS:  Would you like the paper hard copies

3    of this also, Your Honor?

4              THE COURT:  Yes.

5              THE WITNESS:  Okay.

6              THE COURT:  Would you prefer not have to carry that

7    back?

8              THE WITNESS:  Yes.  I'm surround it, give them to

9    you.

10             MR. SCHOLFIELD:  All the sheets we pulled out are

11   [indiscernible].

12             THE WITNESS:  Okay, yeah.  Oh, these?

13             MR. SCHOLFIELD:  Yeah, they were just to highlight

14   things.  They're [indiscernible].

15             THE WITNESS:  Yeah, but you have another copy.  Why

16   don't you just leave them so he doesn't have to fish them.

17             MR. SCHOLFIELD:  You don't like fishing?

18             THE COURT:  I just wanted to go through some of the

19   costs here, the expenses provided here.  I -- I don't see any

20   that I have a problem with, but the site inspection, Demovsky

21   Lawyer Service, what -- what does that refer to?

22             MR. SCHOLFIELD:  We were -- early on in the case we

23   were attempting to find the sister to do her deposition

24   through the Stafford [ph.] agency and this was when the case

25   was still in Connecticut.  And so the Connecticut court

1  ordered us to show that we made reasonable efforts to do it on

2  our own first because we were asking the defendants to produce

3  her and they had been refusing saying she wasn't an agent.  So

4  that was part of that.

5          We had sent a person, a process server out to

6  attempt to serve a subpoena.  And I -- I think it was listed

7  as a site inspection because he ended up having to look at

8  several different places for her.  And I think he was

9  attempting -- if I recall that one correctly, he had gone to a

10  building and he was attempting to find a person there.  I'm

11  not sure why they put it down as site inspection, but that I

12  think is how it was billed to us.

13          THE COURT:  Okay.  And then there's a video,

14  Geometrix Productions.

15          MR. SCHOLFIELD:  We had been asked by the Probate

16  Court for the purposes of this litigation to do a Day in the

17  Life video.

18          THE COURT:  Okay.

19          MR. SCHOLFIELD:  And we ultimately --

20          THE COURT:  For the purpose of this litigation?

21          MR. SCHOLFIELD:  Yeah.  The Probate Court was

22  tangentially involved in the litigation.  The Probate Court --

23  I guess I'm not the court, but my understanding is the Probate

24  Court agreed that part of the reason Mr. Hwang is still

25  conservator that there needed to be some sort of attempt to

Sung-Ho Hwang - By the Court                    65

1    recover on behalf of this young man, and so that was what that

2    was part of.

3              THE COURT:  The investigator in Korea for a property

4    search?

5              MR. SCHOLFIELD:  Correct, Your Honor.

6              THE COURT:  Is there -- is there a procedure that --

7              MR. SCHOLFIELD:  Our understanding is that's --

8              THE COURT:  -- worked?

9              MR. SCHOLFIELD:  -- sort of like the Hague.  And

10   through an interesting circumstance, Your Honor, we've been

11   contacted by an attorney in Fiji who has some involvement with

12   this church and appears to have property there as well.  That

13   was unsolicited.  That just sort of happened, but --

14             THE COURT:  Is this not the only incident involving

15   this church?  What, similar?

16             MR. SCHOLFIELD:  I'm not testifying, Your Honor, of

17   course, the answer is my understanding is that this is not the

18   only incident.  There's an incident in Chicago with a person

19   who disappeared, another person disappeared.  There's an

20   incident in Fiji with an attack on several people.

21             THE COURT:  Wow.  All right.

22             MR. SCHOLFIELD:  And I guess since we were the first

23   to run into them, we get called [indiscernible].

24             THE COURT:  And if you do have a recovery in this

25   case, is there anything that this Court will need to do?

1    Would you be going through us to --

2              MR. SCHOLFIELD:  I think the -- except for getting

3    certified judgments that we'll then try to domesticate most

4    likely in both Fiji and Korea at this point in time --

5              THE COURT:  Um-hum.

6              MR. SCHOLFIELD:  -- I believe that's the extent of

7    this Court's involvement.  I have to do a little bit more

8    research to make sure.  I don't use the Hague that often.

9              THE COURT:  Right.  We do it for other purposes,

10   usually.

11             MR. SCHOLFIELD:  That would be essentially the

12   [indiscernible].

13             THE COURT:  Yeah, it's a good idea.  Can you get a

14   copy of the video?

15             MR. SCHOLFIELD:  It was never made because members

16   of the church showed up and essentially thwarted the video

17   being made.

18             THE COURT:  Really?

19             MR. SCHOLFIELD:  I wish we did have it.  Yeah.  I

20   wish we had it.  It's -- it's been an interesting case, Your

21   Honor.

22             THE COURT:  Yes.

23             UNIDENTIFIED VOICE:  That's an understatement.

24             THE COURT:  Does the church have any -- any property

25   in this country at this time?

Sung-Ho Hwang - By the Court                    67

1        MR. SCHOLFIELD:  Not anymore.  It appears that when

2   these events were happening and then shortly thereafter they

3   had a property over in Flushing.  The most recent searches

4   show that it doesn't belong to them anymore.  It's not clear

5   to me if they were ever renting or if they owned it, but

6   they're definitely not there anymore.  It was turned into a

7   liquor store I believe, if I remember correctly.

8   BY THE COURT:

9   Q.   Okay.  Anything else you'd like to add, sir?

10  A.   No, Your Honor.

11       THE COURT:  All right.  Well, thank you.  We'll go

12  off the record.

13            (Off the record.)

14            THE COURT:  Yeah, [indiscernible].  Is it in the

15  records what happened in the criminal cases?  Do we have

16  defendants' exhibits or not?

17            MR. SCHOLFIELD:  I'm not certain, Your Honor.

18            THE WITNESS:  The police report.  Well, you have the

19  police report, but.

20            MR. SCHOLFIELD:  They were arrested and incarcerated

21  and I think they pleaded to something, yeah.

22            THE WITNESS:  Oh, I -- yeah.

23            MR. SCHOLFIELD:  My understanding is they were

24  incarcerated for eight months at Rikers.

25            THE COURT:  So that would be --

1            MR. SCHOLFIELD:  I'm not sure if that's in the

2 records.

3            THE COURT:  Do you have the docket number of those

4 cases?  Do we have any -- any information off them or not?

5            MR. SCHOLFIELD:  No.  We got -- we learned that

6 through the sister.

7            THE WITNESS:  Well, we can find -- we can send you

8 the docket number.  That's --

9            MR. SCHOLFIELD:  Yeah, we can look them up.

10           THE WITNESS:  That's not hard to do.

11           THE COURT:  Okay.  That would -- that would be

12 helpful.

13           MR. SCHOLFIELD:  Certainly.

14           THE COURT:  I know that goes more to liability than

15 damages, but it's -- you never know what you find.

16           MR. SCHOLFIELD:  Sure.  For sure.

17           THE COURT:  I think that's it.  All right.  Thank

18 you very much.

19           MR. SCHOLFIELD:  Thank you, Your Honor.

20           THE WITNESS:  Thank you, Your Honor.

21           (Proceedings concluded at 1:09 p.m.)

22                * * * * * * *

23

24

25

69

1          I certify that the foregoing is a court transcript

2    from an electronic sound recording of the proceedings in the

3    above-entitled matter.

4

5    _____

6                    Ruth Ann Hager, C.E.T.**D-641

7    Dated:   January 10, 2018

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25