UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SUNG-HO HWANG, CONSERVATOR OF
THE ESTATE OF SEUNGICK CHUNG,

                             Plaintiff,

               -against-

GRACE ROAD CHURCH (IN NEW YORK);
GRACE ROAD CHURCH (IN SOUTH KOREA);
and OK-JOO SHIN,

                        Defendants.
------------------------------------------------------------X

REPORT AND
RECOMMENDATION

14 CV 7187 (KAM) (RML)

LEVY, United States Magistrate Judge:

           On September 19, 2017, the Honorable Kiyo A. Matsumoto, United States

District Judge, granted plaintiff's motion for a default judgment as to his claims for false

imprisonment, intentional infliction of emotional distress, assault, battery, breach of fiduciary

duty, and respondeat superior as to all defendants.  (Memorandum and Order, dated Sept. 19,

2017 ("M&O"), Dkt. No. 77.)  Judge Matsumoto referred the issue of damages to me for report

and recommendation.  (Id.)  I conducted an inquest hearing on December 18, 2017 (see

Transcript of Hearing, dated Dec. 18, 2017 ("Tr."), Dkt. No. 83), after which plaintiff's counsel

filed a supplemental submission.  For the reasons explained below, I respectfully recommend

that plaintiff be awarded $3,950,000, with leave to file proper documentation of costs.

## BACKGROUND AND FACTS

           Familiarity with the prior proceedings is assumed.  Briefly, plaintiff Seungick

Chung ("plaintiff" or "Mr. Chung"), prosecuting this action through conservator Sung-Ho

Hwang, Esq., commenced this action in the District of Connecticut on November 26, 2013[1]

against defendants Grace Road Church (in South Korea) ("Korean Grace Road Church"), Grace

Road Church (in New York) ("U.S. Grace Road Church," and together with Korean Grace Road

Church, "Grace Road Church"), and the founder and pastor of Grace Road Church, Ok-Joo Shin

("Shin," and collectively with Grace Road Church, "defendants") seeking damages for physical

and emotional injuries.  (See Complaint, dated Nov. 26, 2013, Dkt. No. 1.)  Defendants initially

appeared and moved to dismiss the complaint.  On March 14, 2016, the court granted in part and

denied in part defendants' motion to dismiss.  Hwang v. Grace Road Church (in New York), No.

14 CV 7187, 2016 WL 1060247 (E.D.N.Y. Mar. 14, 2016).  Plaintiff then amended his

complaint (see Third Amended Complaint, dated Apr. 12, 2016 ("Third Am. Compl."), Dkt. No.

69), after which defendants' counsel moved to withdraw.  That motion was granted (see Order,

dated Aug. 9, 2016), and on September 7, 2017, after defendants failed to retain new counsel or

otherwise appear, the Clerk of the Court entered defendants' defaults.  (Clerk's Entries of

Default, dated Sept. 7, 2017.)

On September 19, 2017, the court granted in part and denied in part plaintiff's

motion for default judgment.  (See M&O.)  Specifically, the court granted plaintiff's motion as to

his claims for false imprisonment, intentional infliction of emotional distress, assault, battery,

breach of fiduciary duty, and respondeat superior.  (Id. at 19.)  It denied the balance of plaintiff's

motion for default judgment and referred the issue of damages to me for report and

recommendation.  (Id.)

At the inquest hearing on December 18, 2017, plaintiff's conservator, attorney

Sung-Ho Hwang, was the sole witness.  Mr. Hwang testified that the Probate Court in Hartford,

---

[1]  This matter was transferred to this court in December 2014.  (Dkt. No. 51.)

Connecticut appointed him conservator for the person and estate of plaintiff Seungick Chung in May 2013.  (Tr. at 5-6, Inquest Ex. 1.)  He explained that he was appointed to act in Mr. Chung's best interests because Mr. Chung had been diagnosed with schizophrenia and was deemed incompetent.[2]  (Id. at 7; see also Third Am. Compl. ¶ 10 (stating that plaintiff "has a history of severe mental [illness] and has been diagnosed with Schizophrenia (Paranoid Type), Anxiety Disorder [and] a history of Seizure Disorder.")

Mr. Hwang testified that at the time of his appointment as conservator, Mr. Chung was living at the Trinity Hill Care Center, a skilled nursing and mental health facility in Hartford, Connecticut.  (Tr. at 8.)  Mr. Hwang first visited Mr. Chung there in June 2013, and found him in a wheelchair, "heavily sedated" and "emaciated," with his right leg amputated above the knee.  (Id. at 8-10.)

Mr. Hwang then conducted an investigation into how Mr. Chung came to be in that condition.  (Id. at 11.)  He interviewed Mr. Chung's father, sister, and sister's fiancé (id. at 11-12, 29), and reviewed Mr. Chung's medical records, obtained via a HIPAA request (id. at 21-22), as well as police reports, obtained via a FOIA request (id. at 16, Exs. 5, 6).[3]  His

---

[2]  Mr. Hwang explained that he does not normally work as a conservator, but was asked to do so in this case because he is a native Korean speaker.  (Tr. at 5.)

[3]  These records were admitted into evidence at the inquest hearing.  (See Tr. at 25.)  Medical records "can be admissible under Federal Rule of Evidence 803(6), provided they are prepared in the regular course of business, near the time of occurrence, by a person with knowledge and are properly authenticated."  Hodges v. Keane, 886 F. Supp. 352, 356 (S.D.N.Y. 1995) (citing Romano v. Howarth, 998 F.2d 101, 108 (2d Cir. 1993)).  Properly authenticated "[s]tatement[s] that . . . [are] made for—and [are] reasonably pertinent to—medical diagnosis or treatment; and . . . describe [ ] medical history; past or present symptoms or sensations; their inception; or their general cause" are also admissible under Federal Rule of Evidence 803(4).  FED. R. EVID. 803(4).  Likewise, police reports are admissible under the business records exception to the hearsay rule.  See United States v. Carneglia, 256 F.R.D. 384, 391 (E.D.N.Y. 2009) (citing United States v. Snyder, 787 F.3d 45, 77 (10th Cir. 1977)).  They may also be admissible under

(continued...)

investigation found, and the default judgments in this case establish, that Mr. Chung was the victim of a religious order's unfortunate and misguided attempts to treat his psychosis through faith healing.

According to the police and court records, and as confirmed by Mr. Hwang's investigation, Mr. Chung's sister, Myung Hee Chung, and her fiancé, Sung-Peel Youn, were members of Grace Road Church and followers of Shin.  (Id. at 19, 28-29.)  Shin, the founder and head minister of Grace Road Church, preached "that individuals with maladies could, under [her] specific tutelage. . . , be healed through the application of meditation and prayer."  (Third Am. Compl. ¶¶ 11, 12.)  In September 2012, at defendant Shin's direction, Ms. Chung convinced plaintiff to travel from his parents' home in Connecticut to a Grace Road Church residence and house of worship in Queens, New York for the purpose of attempting to cure his schizophrenia through prayer.  (Id. ¶ 18.)  Mr. Chung was twenty-six years old at that time.  (Tr. at 34.)

Upon plaintiff's arrival at the Grace Road Church facility in Queens, Shin and the other church members discontinued his prescription medication, which "caused outbursts and exacerbation of Mr. Chung's psychotic symptoms, including: visual/auditory hallucination, suicidal thoughts, self-mutilation, self-deprivation of foods and other compulsory behaviors." (Third Am. Compl. ¶¶ 23-25; see also Tr. at 19-20, 53.)  On September 25, 2012, Mr. Chung "experienced a psychotic episode during which he left the custody of the Defendants and Ms. Chung, and aimlessly wandered in a confused state about Queens, New York."  (Third Am. Compl. ¶ 27.)  Mr. Chung's sister filed a missing person report with the New York Police Department.  (See Inquest Ex. 5.)  However, Mr. Chung was found a few hours later and brought

---

the public records and reports hearsay exception, FED. R. EVID. 803(8), or under the hearsay exception for recorded recollections in Federal Rule of Evidence 803(5).

back to the church, where his symptoms worsened and he became more agitated.  (Id. ¶¶ 28-30; Tr. at 20; Inquest Ex. 5.)

On October 10, 2012, in order to restrain Mr. Chung's outbursts, "church members, under the supervision of [defendant] Shin, tied his wrists, ankles, and knees in a chair or bed with duct tape, and put a sock in his mouth to restrain his screams at night."  (Third Am. Compl. ¶ 31; see also Tr. at 21, 29.)  That physical restraint "continued without appreciable interruption through October 12, 2012," during which time plaintiff "made several complaints about a severe pain he was experiencing in his right leg" and church members "noticed the discoloration of the right leg."  (Third Am. Compl. ¶¶ 31-32.)  Nonetheless, the church members failed to provide medical attention, and as a result, the severe constriction of the blood vessels in Mr. Chung's right leg developed into gangrene.  (Id. ¶¶ 32-33.)

When they could not heal his leg through prayer and massage, the church members took Mr. Chung to a dermatologist, who referred him to the emergency room at New York Hospital Queens.  (Tr. at 29-31; Inquest Ex. 7 at 20-21.)  Ultimately, his right leg had to be amputated above the knee, and Mr. Chung spent approximately one month in the hospital, recovering from surgery, receiving treatment for hypertension and rhabdomyolysis, and undergoing physical therapy.  (Tr. at 33-34.)  On November 20, 2012, he was transferred to the Trinity Hill Care Center, where he eventually received a prosthetic leg.[4]  (Id. at 42.)

Several church members were arrested and sentenced to prison for their actions related to the loss of Mr. Chung's leg.  Among them was his sister, Myung Hee Chung, who

---

[4]   Mr. Hwang testified that he believes Mr. Chung is currently living in South Korea, where his mother, also a Grace Road Church member, took him without authority.  (Tr. at 60-61.  See also Chung 1225 (Nurses Progress Note from July 17, 2015, stating that plaintiff had been signed out by his mother at 8:45 a.m. and had not returned, and the staff was unable to locate his passport, which was supposed to have been relinquished prior to leaving the facility.)

pleaded guilty to reckless endangerment and spent eight months in prison.  (Inquest Ex. 7 at 9, 29.)

Plaintiff requests a judgment of $7,410,750 in damages, including $3 million in punitive damages.  (See Damages Analysis, dated Dec. 11, 2017 ("Damages Analysis"), Dkt. No. 82, at 10.)  He also seeks costs totaling $6,029.92.  (Id. at 10-12.)

## DISCUSSION

"When a default is entered, the defendant is deemed to have admitted all of the well-pleaded factual allegations in the complaint pertaining to liability."  Bravado Int'l Grp. Merch. Servs., Inc. v. Ninna, Inc., 655 F. Supp. 2d 177, 188 (E.D.N.Y. 2009) (citing Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992)).  "While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation."  Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974) (citations omitted); see also Bravado Int'l, 655 F. Supp. 2d at 189 (citation omitted).  "[E]ven upon default, a court may not rubber-stamp the non-defaulting party's damages calculation, but rather must ensure that there is a basis for the damages that are sought."  Overcash v. United Abstract Grp., Inc., 549 F. Supp. 2d 193, 196 (N.D.N.Y. 2008) (citing Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999)). The burden is on plaintiff to establish his entitlement to recovery.  Bravado Int'l, 655 F. Supp. 2d at 189 (citation omitted).  I will address the damages calculations for each of plaintiff's claims in turn.

1.   False Imprisonment

"Under New York law, the elements of a false imprisonment claim are: '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement,

6

(3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" Weyant v. Okst, 101 F.3d 845, 853 (2d Cir. 1996) (citing Broughton v. State, 373 N.Y.S.2d 87, 93 (N.Y. 1975)).  In her Memorandum and Order, Judge Matsumoto found that plaintiff had sufficiently pleaded each of these elements and therefore established defendants' liability for false imprisonment.[5]  (M&O at 10-11.)

A plaintiff entitled to compensatory damages for false imprisonment may be awarded either general damages or special damages.  Kerman v. City of New York, 374 F.3d 93, 125 (2d Cir. 2004) (citing Charles T. McCormick, HANDBOOK ON THE LAW OF DAMAGES ("MCCORMICK ON DAMAGES") § 107, at 375–77 (1935)).  "General damage is a 'harm of a sort inseparable from [the unlawful] restraint.'"  Id. (quoting MCCORMICK ON DAMAGES § 107, at 375) (brackets in original).  For "false imprisonment, upon pleading and proving merely the unlawful interference with his liberty, the plaintiff is entitled to 'general' damages for loss of time and humiliation or mental suffering."  Id.; see also William Lloyd Prosser & W. Page Keeton, THE LAW OF TORTS § 11, at 48 (5th ed. 1984) ("The plaintiff is entitled to compensation for loss of time, for physical discomfort or inconvenience, and for any resulting physical illness or injury to health.  Since the injury is in large part a mental one, the plaintiff is entitled to damages for mental suffering, humiliation, and the like.") (footnotes omitted). General damages " need not be specifically proved" but "may be inferred from the circumstances

---

[5]  I note that, under New York law, claims for false imprisonment, intentional infliction of emotional distress, assault, and battery are subject to a one-year statute of limitations.  See N.Y. C.P.L.R. § 215(3).  In this case, plaintiff was admitted to the hospital on October 12, 2012, and the complaint was filed over a year later, on November 26, 2013.  However, Judge Matsumoto has held that plaintiff met his burden to show that he was suffering from "insanity at the time the cause of action accrue[d]."  N.Y. C.P.L.R. § 208.  Therefore, the statute of limitations has been equitably tolled.  See Hwang v. Grace Rd. Church (in New York), No. 14 CV 7187, 2016 WL 1060247, at *7 (E.D.N.Y. Mar. 14, 2016).  It bears noting, as well, that the statute of limitations for all torts is three years in Connecticut, where this case was initially filed.  CONN. GEN. STAT. ANN. § 52-577 (West 2018).

of the . . . imprisonment" and "would include at least the value of the time lost by the plaintiff

during the period of detention." Kerman, 374 F.3d at 125.  Special damages must be specifically

pleaded and proven, and commonly include "physical discomfort, shock, or injury to health,"

"loss of . . . employment," and "injury to the plaintiff's reputation or credit." Id. (quoting

MCCORMICK ON DAMAGES § 107, at 376).  "As a general rule, the measure of damages for

false . . . imprisonment is such a sum as will fairly and reasonably compensate the injured person

for injuries caused by defendant's wrongful act, including damages for physical and mental

suffering." Woodard v. City of Albany, 439 N.Y.S.2d 701, 702 (3d Dep't 1981).

Here, plaintiff is entitled to special damages, as the confinement included physical

restraint over the course of several days that caused him severe physical and emotional pain and

suffering.  Plaintiff requests one million dollars in damages for "[s]uffering during

imprisonment," arguing that he experienced "unspeakable terror" during the time he "was held

prisoner in the basement of the cult's facility."  (Damages Analysis at 10.)  However, plaintiff's

counsel has cited no cases awarding damages for false imprisonment, and while it is

incontrovertible that plaintiff was frightened and in pain during his confinement, his

unavailability and inability to testify make an assessment of his special damages difficult.

While the court's research uncovered cases awarding a million or more dollars

for false imprisonment, those cases generally involved plaintiffs who were wrongfully convicted

of crimes and sentenced to long prison terms.[6]  Decisions in cases not involving wrongful

---

[6]  See, e.g., Newton v. City of New York, 171 F. Supp. 3d 156, 177 (S.D.N.Y. 2016) (reducing
damage award to one million dollars per year of incarceration, or $12 million); Limone v. United
States, 497 F. Supp. 2d 143, 243 (D. Mass. 2007) (awarding one million dollars per year of
incarceration to four exonerees sentenced to life imprisonment or death, and noting that "all of
them literally lost a lifetime."), aff'd, 579 F.3d 79 (1st Cir. 2009); Kotler v. State, 680 N.Y.S.2d
586, 587 (2d Dep't 1998) (upholding award of $1,510,000 to plaintiff who was incarcerated for
(continued...)

8

criminal convictions tend to award considerably less.  See Gonsalez v. Marin, No. 12 CV 1157, 2014 WL 2514704, at *12 (E.D.N.Y. Apr. 25, 2014) (awarding employees $10,000 each for false imprisonment where their employer locked them in a store basement on approximately four or five occasions, with no access to a bathroom, for an hour and a half to five hours each time), report and recommendation adopted, 2014 WL 2526918 (E.D.N.Y. June 4, 2014); Marion v. LaFargue, No. 00 CV 0840, 2004 WL 330239, at *12 (S.D.N.Y. Feb. 23, 2004) (holding that "the maximum sustainable award" to a plaintiff who was involuntarily committed to the psychiatric ward of Bellevue Hospital for six days, without a finding of danger to self or others, was $150,000); Peters v. Rome City Sch. Dist., 747 N.Y.S.2d 867, 869 (4th Dep't 2002) (upholding verdict of $75,000 for false imprisonment of second grader with a learning disability, who was placed in a padded "time-out" room seventy-five times over a six-month period, occasionally for more than one hour).

Here, plaintiff was held in the Grace Road Church facility from approximately September 25, 2012 to October 12, 2012 (Third Am. Compl. ¶¶ 25, 27-28, 34), a period of seventeen days.  He was physically restrained with duct tape for about two days.  (Id. ¶ 31.)  In light of the egregiousness of defendants' conduct, I respectfully recommend that plaintiff be awarded $200,000 for the false imprisonment.

2.   Intentional Infliction of Emotional Distress

Under New York law, a plaintiff alleging intentional infliction of emotional distress ("IIED") must establish: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress."  Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996) (citing

---

over ten years but then cleared by DNA evidence).  I note that an award of $1 million per year comes out to $2,739.73 per day of confinement.

Howell v. N.Y. Post Co., 612 N.E.2d 699, 702 (N.Y. 1993)).  Judge Matsomuto found that

plaintiff had sufficiently pleaded each of these elements and therefore found defendants liable for

IIED.  (M&O at 12.)  Specifically, the court noted that "the extreme and outrageous conduct"

included the "intentional or reckless deprivation of plaintiff's medication, which resulted in

psychological injuries including severe emotional distress, severe trauma, mental anguish, and

progression of his mental anguish."  (Id. at 11-12.)

Plaintiff requests $400,000 for "removal from psychotropic medication and

degradation of mental state."  (Damages Analysis at 10.)  As the Second Circuit has explained,

"[a]wards for mental and emotional distress are inherently speculative," as "[t]here is no

objective way to assign any particular dollar value to distress."  Turley v. ISG Lackawanna, Inc.,

774 F.3d 140, 162 (2d Cir. 2014).  Nonetheless, the court "has an obligation to ensure that such

awards for intangibles be fair, reasonable, predictable, and proportionate."  Id. (citing Payne v.

Jones, 711 F.3d 85, 93 (2d Cir. 2013)).

I have surveyed recent cases awarding damages for intentional infliction of

emotional distress, and the analysis in each is highly fact-specific and subjective.  See, e.g., id. at

161-63 (upholding IIED award of $260,000 to plaintiff who "endured an extraordinary and

steadily intensifying drumbeat of racial insults, intimidation, and degradation over a period of

more than three years," as a result of which he "was hospitalized and diagnosed with post-

traumatic stress disorder, depression, and panic disorder."); Patterson v. Balsamico, 440 F.3d

104, 119 (2d Cir. 2006) (affirming $100,000 compensatory damages award on state law IIED

claim to African-American corrections officer who was subjected to racial slurs on

approximately twelve occasions and assaulted once by white officers, where evidence of

emotional harm was limited to the plaintiff's testimony that he felt humiliated and degraded,

10

could not sleep, and had stomach problems, and there was no evidence that he required any medical treatment); Lation v. Fetner Props., Inc., No. 17 CV 3276, 2018 WL 704397, at *2 (S.D.N.Y. Feb. 5, 2018) (finding $100,000 to be "a fair, reasonable, and proportionate measure of compensatory damages" for IIED, where for about two years plaintiff was subjected to unprovoked racist and homophobic harassment and discrimination, and evidence that plaintiff suffered "humiliation, anxiety, shame, and stress" was limited to plaintiff's s own testimony); Eves v. Ray, 840 N.Y.S.2d 105, 106-07 (2d Dep't 2007) (reducing compensatory damage award for IIED counterclaim from $50,000 to $25,000 where the plaintiff, in an attempt to intimidate the defendant during his legal representation of the plaintiff's former wife in a custody proceeding, threatened the defendant both physically and financially and stalked him, even after the defendant had obtained a temporary order of protection); Mitchell v. Giambruno, 826 N.Y.S.2d 788, 789-90 (3d Dep't 2006) (upholding awards of $50,000 and $35,000 for IIED to two plaintiffs, same-sex partners, whose neighbors "conducted [a] relentless campaign of lewd comments and intimidation directed at plaintiffs and their lifestyle" for two years, causing both plaintiffs severe anxiety and depression.)

        In this case, plaintiff's inability to testify makes it impossible to know whether he has suffered permanent or long-term emotional damage from this ordeal. While he did receive psychiatric treatment and medication after this incident, he was already suffering from profound mental illness that caused him to experience delusions and paranoia; he therefore would have received such treatment regardless. On the date of his admission to New York Hospital Queens, a psychiatric evaluation described him as "[a]lert" and his mood as "calm," with "NO evidence of suicidal or homicidal ideation." (Inquest Ex. 8 at Chung 12.) Upon his admission to the hospital, plaintiff's psychotropic medication was reinstated (id. at Chung 14), and a physician's

evaluation on November 3, 2012 described him as appearing "calm, reactive and responsive," with "no complaints of acute anxiety" and "[n]o overt agitation or restlessness present" (id. at Chung 29).  That entry goes on to state that plaintiff "has been calm and cooperative with care, well redirectable and tolerates his regimen well."  (Id.; see also id. at Chung 33 ("No acute distress"); Chung 24 ("Received [patient] calm and cooperative").

On the other hand, plaintiff was institutionalized after this event, and suffered from depressive disorder and anxiety after the loss of his leg.  (Third Am. Compl. ¶¶ 36-38; see also Inquest Ex. 8 at Chung 17 (prescribing Mirtazapine for depression), 98, 107, 127, 169, 279-80, 411 (noting diagnosis of depression), 281 (describing anxiety), 140, 282-84, 319 (noting prescription for Zoloft, an antidepressant).[7]  Some of the early records from Trinity Hill Care Center describe him as spending his days in his wheelchair or lying in bed  (id. at Chung 60, 286, 288, 290, 293, 303, 389, 668, 797), and expressing feelings of loneliness and isolation (id. at Chung 65, 280, 302, 630); see also id. at Chung 801 (Social Work assessment dated November 20, 2012,  describing plaintiff as "quiet, withdrawn but responsive to questions.").  Fortunately, however, plaintiff's condition appears to have improved while he was in the nursing home. Records from November 2014 state that plaintiff was able to ambulate independently without an assistive device both indoors and outdoors, and had regular outings with his family members and friends.  (E.g., id. at Chung 240-49, 296.)  Progress reports from 2014 and 2015 describe him as "optimistic and positive" and coping well.  (Id. at Chung 300; see also, e.g., id. at Chung 364 ("in relatively good spirits"), 367 ("future-oriented"), 377 ("Pt. continues to feel good about the future."), 387 ("walking w[ith] prosthesis, no cane.  [T]ells me he is "Good!" is doing well overall."), 466 ("Pt seen ambulating independently using prosthesis. Smiling affect. Bright mood

---

[7]   In the absence of plaintiff's pre-incident medical records, the court is unable to discern whether the depression existed prior to these events.

on contact."), 872 (Social Work record from August 2014 noting "Resident is content, no issues at this time.")  Taking all of this into consideration, I respectfully recommend that plaintiff be awarded $100,000 for intentional infliction of emotional distress.

       3.   <u>Assault and Battery</u>

In New York, an assault is "an intentional placing of another person in fear of imminent harmful or offensive contact[,]" while a "battery [is] an intentional wrongful physical contact with another person without consent."  <u>Green v. City of New York</u>, 465 F.3d 65, 86 (2d Cir. 2006).  Judge Mastumoto held that plaintiff had adequately alleged claims for assault and battery.  (M&O at 12-13.)  Plaintiff seeks an award of $3,010,750 for past and future pain and suffering and mental anguish related to the assault and battery, which resulted in the amputation of his right leg above the knee due to severe necrosis of the tissue.  (<u>See</u> Damages Analysis at 10.)  This consists of $10,750 for "constriction injuries to ankles, knees, wrists, neck, mouth and face," one million dollars for "pain from gradual death of muscle and other tissue in leg," and two million dollars for "suffering post-surgery, loss of leg for a 26 year old male."  (<u>Id.</u>)

       The loss of a leg—and the attendant health and mobility problems resulting from an amputation—is unquestionably serious.  It is difficult, however, to translate that loss into precise monetary terms.  Generally, the factors courts consider in determining damages for an amputation are: (1) the nature and extent of the amputation, (2) the plaintiff's occupational status at the time of the amputation, (3) the plaintiff's past and future medical expenses, (4) the extent of the plaintiff's recovery, and (5) the plaintiff's general mental and physical condition before and after the amputation, including physical and mental suffering.  <u>Williams v. United States</u>, 747 F. Supp. 967, 1011 (S.D.N.Y. 1990) ($500,000 pain and suffering award for prisoner as a result of prison hospital's negligence in treating a foot infection that led to a below-the-knee

amputation).  Here, plaintiff does not seek damages relating to medical expenses or loss of income.

Damages for pain and suffering are especially difficult to quantify and vary greatly depending on the facts and circumstances of each case.  In fashioning an appropriate award, courts typically consider the decisions of other court and jury verdicts involving similar injuries.  Glassman-Brown v. Pouring Wine, LLC, No. 14 CV 3763, 2016 WL 1358585, at *3 (S.D.N.Y. Feb. 29, 2016), report and recommendation adopted, 2016 WL 1367230 (S.D.N.Y. Apr. 5, 2016).  Plaintiff's counsel has submitted four citations to jury verdicts based on partial leg amputations.  See Schultz v. Excelsior Orthopedics, LLP, 2015 N.Y. Slip Op. 05321 (4th Dep't June 19, 2015) (upholding 2014 jury verdict of $6 million ($2 million for past pain and suffering and $4 million for future pain and suffering) for above-the-knee amputation of thirty-six year-old man resulting from medical malpractice); Sanders v. New York City Transit Auth., 2011 N.Y. Slip. Op. 03046 (2d Dep't Apr. 12, 2011) (upholding 2009 jury award of $6 million for above-the-knee amputation of a forty-one year-old man resulting from a subway accident); Aguilar v. New York City Transit Auth., 2011 Slip Op. 01117 (1st Dep't Feb. 17, 2011) (2009 jury award of $16 million for above-the-knee amputation of a forty-five year-old woman resulting from a bus accident, reduced to $10 million on appeal); Firmes v. Chase Manhattan Automotive Fin. Corp., 852 N.Y.S. 2d 148 (2d Dep't 2008) (reducing jury verdict from $2.2 million for past pain and suffering to $1.5 million and from $5.2 million for future pain and suffering to $3.5 million, where plaintiff was involved in a motorcycle accident, underwent eleven surgeries, and lost his left leg below the knee).

In addition to the citations provided by plaintiff's counsel, the court has surveyed pain and suffering awards in other cases involving amputated or lost limbs.  In each case, the

award was highly fact-specific.  See, e.g., Norcia v. Dieber's Castle Tavern, Ltd., 980 F. Supp. 2d 492, 508 (S.D.N.Y. 2013) (cruise ship passenger who suffered permanent injuries to both arms in accident with intoxicated speedboat driver, losing significant functionality, awarded $1,266,000 for past pain and suffering and $1,435,140 for future pain and suffering, based on a projected life expectancy of fifty-one years); Marin v. New York City Health & Hosps. Corp., 43 N.Y.S.3d 289, 290 (1st Dep't 2016) (upholding jury award of $2 million for past pain and suffering and $4 million for future pain and suffering over thirty years, in malpractice action where plaintiff provided evidence that his amputated leg could have been saved following car accident); DeLaCruz v. New York City Transit Auth., 11 Misc. 3d 1086A (Sup. Ct., Queens Cty. 2006) (jury award of $2.5 million for past pain and suffering and $12.5 million for future pain and suffering reduced to $1 million and $2 million, respectively, for a twenty-nine year-old woman who was struck by a bus, which crushed her right foot, leaving it disfigured and virtually useless), aff'd, 48 AD3d 508 (2d Dep't 2008); Nunez v. Levy, 19 Misc.3d 1138A (New York Sup. Ct. 2008) (jury award of $5 million for past pain and suffering and $5 million for future pain and suffering to a twenty-five year–old man who lost his leg below the knee as a result of a work accident in which a vault door fell on his foot, reduced by the trial court on a motion to set aside the verdict to $2.5 million and $4 million, respectively); see also Villalba v. Rockford Sys., Inc., No. 02 CV 4455, 2006 WL 526660, at *5 (E.D.N.Y. Mar. 3, 2006) (awarding $50,000 for past pain and suffering and $50,000 for future pain and suffering for the partial loss of two digits on plaintiff's dominant hand, where the treating doctor's prognosis was that he would regain function in the injured hand and be able to lead a relatively normal life).

    Plaintiff's counsel has submitted nearly 1,300 pages of medical records, including emergency room, surgical, physical therapy, occupational therapy, psychiatric, and rehabilitation

records.  (See Inquest Ex. 8.)  Collectively, they portray a young man with profound mental illness who suffered physical and emotional trauma as a result of the acts committed against him, and whose life was permanently altered by the loss of his leg and the resulting institutionalization.  The records from New York Hospital Queens also describe injuries to plaintiff's hands resulting in pain, as well as scabs and lacerations on his neck and mouth.  (Id. at Chung 7, 8, 25.)

On the other hand, the court lacks the benefit of testimony from plaintiff, or from any medical or mental health care provider or expert, concerning the pain and suffering he has experienced, or can expect to experience in the future.  In fact, some of the records describe plaintiff as non-verbal, at least initially.[8]  This does not make him any less able to feel pain or to suffer emotionally, and in fact it may heighten his pain and suffering.  It does, however, hamper the court's ability to gauge the impact on him.  I also note that, by November 17, 2012, the medical records state that plaintiff was reporting "No Pain" (see id. at Chung 34, 37), and the hospital staff observed "No acute distress" (id. at Chung 35-36).  Other records from Trinity Hill Care Center indicate that plaintiff reported some leg or stump pain and swelling, which usually resolved with ibuprofen.  (Id. at Chung 87-88, 93-94, 108, 130.)  But by mid-2014, plaintiff was reporting "no pain" (id. at Chung 730) or saying "I feel good" (id. at Chung 735).  See also Chung 744 (August 2014 Physical Therapy Progress Report, noting that plaintiff's condition was "improving" he was "progressing with current treatment interventions" and "making consistent progress towards reaching [short-term] and [long-term] goals," and he was "compliant" with treatment."); Chung 758 (September 2014 Physical Therapy Treatment Encounter Note, stating

---

[8]  It is unclear whether plaintiff was fully conversant in English at this time, or the extent to which he communicated through interpreters.  See Inquest Ex. 8 at Chung 825 (noting that Behavior Director Jenny Sung "speaks Korean and has been assisting with translation.")

that plaintiff received a new prosthetic leg and reported "It feels great!"); Chung 766-74

(Physical Therapy Treatment Encounter Notes from October 2014, with plaintiff reporting "I feel

pretty good" and "It[']s getting easier.")

"In making an award for future pain and suffering . . . the fact-finder is

determining the sum that the plaintiff should have now as compensation for the pain and

suffering he will endure." Oliveri v. Delta S.S. Lines, Inc., 849 F.2d 742, 751 (2d Cir. 1988).

"Future pain and suffering damages are calculated in part through reference to actuarial tables to

determine the projected life span of the plaintiff." House v. Kent Worldwide Machine Works,

Inc., 359 F. App'x 206, 209 (2d Cir. 2010). Here, plaintiff's life expectancy is approximately

forty-eight additional years, based on actuarial tables.[9] However, the life expectancy for men

with schizophrenia is typically fifteen years shorter.[10] I therefore recommend that plaintiff's

future pain and suffering award be based on an estimated life expectancy of thirty-three years.

Taking all this into account, I recommend that plaintiff be awarded $1,000,000 for past pain and

suffering and $1,650,000 (or $50,000 per year of life expectancy) for future pain and suffering,

for a total of $2,650,000.

4.   Breach of Fiduciary Duty

"The elements of a breach of fiduciary duty claim are (1) that a fiduciary duty

existed between plaintiff and defendant, (2) that defendant breached that duty, and (3) damages

as a result of the breach." Meisel v. Grunberg, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009) (citing

---

[9]  See United States Department of Health and Human Services National Vital Statistics Report,
https://www.cdc.gov/nchs/nvss/mortality/lewk3.htm.  I have not considered plaintiff's race or
ethnicity, as "[r]ace-based statistics and other race-centric data cannot be relied upon" in
calculating life expectancy for a claimant in computing tort damages.  See G.M.M. ex rel.
Hernandez-Adams v. Kimpson, 116 F. Supp. 3d 126, 140 (E.D.N.Y. 2015).

[10]  See New Findings on Mortality of Individuals with Schizophrenia,
https://www.sciencedaily.com/releases/2013/01/130121103329.htm (Jan. 21, 2013).

Whitney v. Citibank, N.A., 782 F.2d 1106, 1115 (2d Cir. 1986)).  "When examining whether a fiduciary relationship exists under New York law, a court examines 'whether one person has reposed trust or confidence in the integrity and fidelity of another who thereby gains a resulting superiority or influence over the first.'"  Eagle One Roofing Contractors, Inc. v. Acquafredda, No. 16 CV 3537, 2018 WL 1701939, at *17 (E.D.N.Y. Mar. 31, 2018) (quoting Teachers Ins. & Annuity Ass'n of Am. v. Wometco Enters., Inc., 833 F. Supp. 344, 349-50 (S.D.N.Y. 1993)).  In her Memorandum and Order, Judge Matsumoto found that "[i]n light of the duty the defendants acquired when restraining plaintiff against his will, and based on the allegations in the complaint," plaintiff adequately stated a cause of action for breach of fiduciary duty and therefore established liability for that claim.  (M&O at 14.)

Plaintiff does not request compensatory damages specifically related to the breach of fiduciary duty, as he did not incur any out-of-pocket loss.  Nor does he request any form of equitable relief.  However, the violation of the relationship of trust at issue in this case will be factored into the recommended punitive damages award, discussed below.

5.   Punitive Damages

Plaintiff requests $3 million in punitive damages, describing defendants' acts as "unspeakably horrific and egregious."  (Damages Analysis at 8, 10.)  Generally, "the purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior."  Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 306 n.9 (1986); see also Morelli & Gold, LLP v. Altman, 897 N.Y.S.2d 671, 2009 WL 2152138, at *12 (Sup. Ct., N.Y. Cty. 2009) ("[I]t is well settled that the purpose of punitive damages is not to remedy private wrongs, but to vindicate public rights."); Deborah S. v. Diorio, 583 N.Y.S.2d 872, 879 (Civ. Ct., N.Y. Cty. 1992) (a punitive damages award is intended "to serve as a warning

18

to others" and "as punishment for gross misbehavior for the good of the public."), aff'd as modified, 612 N.Y.S.2d 542 (1st Dep't 1994).  Under New York law, punitive damages must be based on evidence showing that the defendant's conduct "manifest[ed] spite or malice, or a fraudulent or evil on the part of the defendant, or such a conscious and deliberate disregard of the interest of others that the conduct may be called willful or wanton."  Marinaccio v. Town of Clarence, 986 N.E.2d 903, 906 (N.Y. 2013).  The Second Circuit has found it "generally recognized that, in cases of personal torts, 'vindictive actions,' such as assault and battery . . . where the elements of fraud, malice, gross negligence, cruelty, or oppression are involved, punitive or exemplary damages may be recovered."  Pepe v. Maklansky, 67 F. Supp. 2d 186, 187-88 (S.D.N.Y. 1999) (quoting Walsh v. Segale, 70 F.2d 698, 699 (2d Cir. 1934)).

As for determining the amount of a punitive damages award, this question "reside[s] in the sound discretion of the original trier of the facts."  Deborah S., 583 N.Y.S.2d at 875 (citing Walker v. Sheldon, 223 N.Y.S.2d 488, 490 (1961)).  Moreover, "[t]here is no formula by which punitive damages are fixed."  Id.  Nevertheless, certain considerations may guide the court's determination, including: "[the] defendant's motive; the existence or absence of malice or intentional disregard to plaintiff's rights or reckless indifference thereto; the nature, quality and duration of harm inflicted upon plaintiff; defendant's financial wealth or assets; and the degree of deterrent resulting from a punitive award."  Offei v. Omar, No. 11 CV 4283, 2012 WL 2086294, at *7 (S.D.N.Y. May 18, 2012) (citing Deborah S., 583 N.Y.S.2d at 878), report and recommendation adopted, 2012 WL 2086356 (S.D.N.Y. June 8, 2012).  The court is obligated to ensure that punitive damages are "'fair, reasonable, predictable, and proportionate,'" in order "to avoid extensive and burdensome social costs, and to reflect the fact that punitive awards are imposed without the protections of criminal trials."  Turley, 774 F.3d at 164 (quoting Payne, 711

19

F. 3d at 93–96); see also State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 417 (2003) ("To the extent an award [of punitive damages] is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property."); Patterson, 440 F.3d 104, 122 (2d Cir. 2006) ("'even outrageous conduct will not support an oppressive or patently excessive award of [punitive] damages.'") (quoting Brink's Inc. v. City of New York, 546 F. Supp. 403, 413–14 (S.D.N.Y. 1982) (internal quotation marks omitted)).

A review of cases awarding punitive damages reveals a wide range of awards, depending largely on the egregiousness of the conduct at issue and the need for deterrence. See Rosas v. Balter Sales Co. Inc., No. 12 CV 6557, 2018 WL 3199253, at *12 (S.D.N.Y. June 29, 2018) (remitting punitive damage award from $1.4 million to $700,000 against defendants found liable for race discrimination in employment, where plaintiff was harassed, assaulted, fired, and falsely charged with a crime); Noonan v. Becker, 14 CV 4084, 2018 WL 1738746, at *9 (S.D.N.Y. Apr. 10, 2018) (awarding $1,000,000 in punitive damages against defaulting defendant police officer based on unchallenged factual allegations of deliberate and outrageous conduct, including false arrest, prosecution of false charges, sexual assault, battery and rape), report and recommendation adopted, 2018 WL 2088279 (S.D.N.Y. May 3, 2018); Doe v. HRH Prince Abdulaziz Bin Fahd Alsaud, Saudi Oger Ltd., No. 13 CV 571, 2017 WL 4541426, at *7 (S.D.N.Y. Oct. 10, 2017) ($1,000,000 punitive damage award against defendant who drugged and sexually assaulted the plaintiff and her friend in a violent attack that lasted hours); Ahrens v. Stalzer, 791 N.Y.S.2d 867, 867 (Dist. Ct., Nassau Cty. 2004) (awarding plaintiffs $3 million in punitive damages where the defendant broke into the plaintiffs' home while they were out of town, flooded the house, stole six family photo albums and the wife's underwear, and smeared the walls with defamatory writing about the husband having an affair).

In this case, defendants preyed on a vulnerable person and committed reprehensible acts of abuse.  See BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575-76 (1996) (explaining that reprehensibility is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award" and noting that physical assaults generally demonstrate a higher degree of reprehensibility than nonviolent crimes).  Moreover, as mentioned above, the acts betrayed a relationship of trust and took advantage of familial and religious ties.  Under the exceptional and egregious facts of this case, I find that $1,000,000 is a fair and reasonable punitive damages award.

6.  Costs

Plaintiff also requests $6,029.92 in costs, including $1,706.35 for "Investigative services – Personal Protection  Services," $732.99 for "Video – Geomatrix Productions," $780 for "Investigator in Korea, Youngjin Noh, for property search," and $600 for "Pro Hac Vice Admission Fees, EDNY."[11]  (See Damages Analysis at 10-13.)   Under New York law, "[t]he party in whose favor a judgment is entered is entitled to costs in the action, unless otherwise provided by statute or unless the court determines that to so allow costs would not be equitable, under all of the circumstances."  N.Y. C.P.L.R. § 8101.  In addition, "[a] party to whom costs are awarded in an action . . . is entitled to tax his necessary disbursements for:

> 1. the legal fees of witnesses and of referees and other officers;
> 2. the reasonable compensation of commissioners taking depositions;
> 3. the legal fees for publication, where publication is directed pursuant to law;
> 4. the legal fees paid for a certified copy of a paper necessarily obtained for use on the trial;
> 5. the expense of securing copies of opinions and charges of judges;
> 6. The reasonable expenses of printing the papers for a hearing, when required;

---

[11]  The pro hac vice admission fee is $150 per attorney in the Eastern District of New York. (https://www.nyed.uscourts.gov/court-info/faq/Attorney_Admissions.)   Three attorneys—Daniel P. Scholfield, Marisa A. Bellair, and Steven J. Errante—have appeared pro hac vice for plaintiff in this case, which should result in a total of $450 in pro hac vice admission fees.

7. The prospective charges for entering and docketing the judgment;

8. the sheriff's fees for receiving and returning one execution;

9. the reasonable expense of taking, and making two transcripts of testimony on an examination before trial, not exceeding two hundred fifty dollars in any one action;

10. the expenses of searches made by title insurance, abstract or searching companies, or by any public officer authorized to make official searches and certify to the same, or by the attorney for the party to whom costs are awarded, taxable at rates not exceeding the cost of similar official searches;

11. the reasonable expenses actually incurred in securing an undertaking to stay enforcement of a judgment subsequently reversed; and

12. any fee imposed by section fifty-three of the general municipal law; and

13. such other reasonable and necessary expenses as are taxable according to the course and practice of the court, by express provision of law or by order of the court."

N.Y. C.P.L.R. § 8301.

However, plaintiff provides no documentation to support the request.  See, e.g., Performance Elecs., LLC v. Tri Valley Recyclers, LLC, 15 CV 710, 2018 WL 2465349, at *1 (E.D.N.Y. May 31, 2018) (motion for costs denied without prejudice to plaintiff submitting documentation to support the request).  I therefore recommend that plaintiff's request for costs be denied, with leave for plaintiff to submit the necessary documentation.

**CONCLUSION**

For the reasons stated above, I respectfully recommend that plaintiff be awarded $3,950,000, representing $200,000 for false imprisonment, $100,000 for intentional infliction of emotional distress, $2,650,000 for past and future pain and suffering resulting from the assault and battery, and $1,000,000 in punitive damages.  I further recommend that plaintiff's request for costs be denied, with leave to submit supporting documentation within thirty days.

Any objection to this report and recommendation must be filed with the Clerk of the Court, with courtesy copies to Judge Matsumoto and to my chambers, within fourteen (14)

days; failure to file objections within the specified time period waives the right to appeal the

district court's order.  <u>See</u> 28 U.S.C. § 636(b)(1); <u>see also</u> FED. R. CIV. P. 72(b), 6(a), 6(d).

Respectfully submitted,


_____/s/_____

ROBERT M. LEVY
United States Magistrate Judge

Dated: Brooklyn, New York
       August 9, 2018